**UNITED STATES of America,**

v.

**Michael PELLER, Harry Peltz and Anthony Torraco, Defendants.**

United States District Court
S. D. New York.

March 18, 1957.

Paul W. Williams, U. S. Atty., New York City, for the United States, by John J. Donahue, Special Asst. to the U. S. Atty., New York City.

Delaney & Donoghue, New York City, for defendant Harry Peltz, by Joseph Leary Delaney, New York City, of counsel

Florence M. Kelley, New York City, for Salvatore Spitale, by Bernard Moldow, New York City, of counsel.

HERLANDS, District Judge.

This is a motion by the defendant Peltz under Federal Rules of Criminal Procedure, Rule 33, 18 U.S.C.A. for a new trial. The motion was argued orally on December 13, 1956. The minutes of that argument have been transcribed. On February 6, 1957, a conference or argument on the settlement of the order was had. The minutes of that conference or argument have been transcribed.

Pursuant to the order of the Court as settled and filed, a hearing was ordered and had commencing March 4, 1957. The hearings continued on March 5th, 6th, 7th, 8th, 11th, 12th and 13th. The record of the hearings runs to 1,110 pages.

The indictment herein named Peltz, Michael Peller, and one Torraco, in three counts. On motion of the United States Attorney, the indictment was severed as to the defendant Torraco. The defendant Peller pleaded guilty to Counts 1 and 3 of the indictment at the opening of the trial on January 3, 1956, but before the jury was selected. The first two counts of the indictment charged substantive offenses predicated upon the sale on or about August 21, 1954, of approximately 17 ounces, 375 grains of heroin. The third count is a conspiracy count.

The defendant Peltz was convicted on January 10, 1956, on the three counts. Peltz and Peller were sentenced on or about January 30, 1956. Although Peltz filed a notice of appeal, the appeal was never perfected.

During the trial, the Government called to the stand Narcotic Agent Harry Mattera. In support of the Government's case, Mattera testified, according to the Court's trial notes, that on August 11, 1954, at about nine p. m. he saw Peltz in Hector's Restaurant, that at that time he had a conversation with Peltz, that present at the conversation were Peller and a man named Phil, and a Bureau of Narcotics special employee, known as

Jim Adams, also known as Salvy. Later that evening in Hector's Restaurant, located at 50th Street and Seventh Avenue, Borough of Manhattan, Mattera and Jim Adams were joined by Peltz, Peller and Phil. Mattera had been introduced as Ricky.

In the course of the ensuing conversation, according to Mattera, Peller said, "Ricky, I would like to tell you why I can't deliver a one-half kilo of stuff at this time. I am in business with Harry (referring to Peltz, who was present) and Solly. We have a plant of our own that we can't go to because we know the agents of the Federal Bureau of Narcotics are maintaining surveillance on this plant, and for that reason we are compelled to go to other individuals for narcotics."

Mattera further testified with reference to this conversation that, at that point, Peltz said, "Yes, there has been a lot of heat since Solly's bust," and then Peltz added that it would be foolish to go near the plant at this time and that it would be wiser to stay away for another week or ten days.

Agent Gabriel Dukas, called by the Government, corroborated the fact that on August 11, 1954, at about nine p. m., he saw the special employee and Mattera enter Hector's Restaurant and that he saw the defendant Peltz, Peller, and another individual join Mattera and the special employee. Dukas did not hear any conversation, nor did he testify to any conversation.

Mattera testified with respect to another meeting on August 18, 1954, when Peltz and Mattera met alone in the vicinity of 50th Street and Seventh Avenue. On that occasion, according to Mattera, he asked Peltz, "Where is Whitey?" Whitey is a nickname for the defendant Michael Peller.

Mattera asked, "Why didn't he show up for his appointment?"

Peltz said, "I don't know where he is." Mattera said that he was angry at Whitey's failure to keep the appointment, and Peltz then said, "Don't get excited; I will make a telephone call." And then Peltz left and returned in five or ten minutes.

Peltz told Mattera that he had spoken to some woman over the phone who had advised him that Peller would be in Hector's Restaurant that evening and Peltz then added, "I will guarantee that he will be there."

Later that evening, on August 19, 1954, a meeting took place at Hector's Restaurant and present were Dolly Turner, Peltz and Peller. Peller introduced Mattera to Dolly Turner and there was a discussion about some individuals in Chicago. Then ensued a conversation which lasted about five or ten minutes between Peller and Mattera which took place outside of Peltz's hearing at a spot about ten feet away.

This conversation was conducted in a low voice. Mattera and Peller sat at another table. The special employee was present at the table where Dolly Turner and Peltz were sitting.

In the conversation between Mattera and Peller, outside the hearing of Peltz, the following ensued:

"Mattera: Whitey, what was the idea of not showing up last night?

"Peller: I smoked a pipe and became sick and I didn't want to get up.

"Mattera: What's the reason for bringing all these persons in to cross examine me about Chicago?

"Peller: I'm ready to deliver a half kilo to you at $5,500 for half a kilo.

"Mattera: That's a rather high price. That makes it $11,000 for a full kilo."

And there was some further comment about why the price was raised.

"Peller: I am forced to go to other people for stuff and that will have to be the price. That would be saving you money anyway because this stuff is pure.

"Mattera: I will try it.

"Peller: I will call you at 2 p. m. in Salvy's room.

"Mattera: That's okay with me."

After this conversation Mattera and Peller rejoined Peltz and Dolly Turner and the special employee at the other

table. And then, according to Mattera, Dolly Turner asked him what cut heroin was bringing in Chicago, to which Mattera replied, "$11,000 a kilo."

At that point the defendant Peltz remarked, "Gee, that's a lot of money. You certainly can make a lot of money there, can't you?

Mattera said, "Yes, I can."

The next meeting testified to by Mattera took place some time after midnight in the early morning of August 21, 1954. Mattera described how he and the special employee met Peller at Ratner's Restaurant, how they got into a taxicab, how Peller turned over narcotics to Mattera and Mattera gave Peller $5,500.

Mattera then got out of that taxicab, brought the narcotics to the Bureau of Narcotics. Meanwhile the special employee and Peller were in the other taxi.

According to Agent Dukas, he saw the meeting of Peller, Mattera and the special employee in Ratner's Restaurant, and he followed them in a taxicab. Three other agents joined in the ensuing surveillance.

Dukas testified how he observed Mattera leaving the taxi in which Mattera had gone with Peller and the special employee. Dukas continued to follow Peller and the special employee and tailed them into Hector's Restaurant. He observed Peller and the special employee enter Hector's Restaurant, and he testified that this observation concerning Peller and the special employee entering Hector's took place at about one a. m.; that Peller and the special employee went to a table and there Peller and the special employee met Peltz and another individual.

These four persons remained there for a while, until about 1:30 a. m. Agent Dukas stayed there for a while and continued his observation, and he observed that Peller, Peltz and this other man left together, and Dukas followed them.

Upon the trial Mattera testified that he saw Peltz again on August 24, 1954, in the vicinity of 50th Street and Seventh Avenue at about 9 p. m. Peltz was

with Peller. A conversation took place. The special employee was present at the conversation according to Mattera, and in substance, according to the Court's trial notes, Mattera said to Peller, "I didn't like the stuff you sold me. The quality was extremely poor. It was only about 15 or 20 per cent."

Peller replied, "You're crazy. That stuff is good stuff."

Mattera said, "Don't tell me I'm crazy, I had the stuff tested. I know how good it is. It is only about 15 or 20 per cent."

At that point, according to Mattera, defendant Peltz said, "Well, you know how it is, sometimes it is good and sometimes it is bad."

To which Mattera replied, "Well, that does not satisfy me."

The Government chemist gave the usual testimony about testing the narcotics and other related matters, as did Agent John Enright. Continuity of possession of the narcotics was established.

The defense called Harry Peltz' brother, Lou Peltz, who testified in substance to the fact that he had employed the defendant Peltz in his business, which was wholesale sporting goods, and that during the times that were material according to the indictment the defendant Harry Peltz had been working for him.

The defendant Peltz took the stand. He testified to his prior criminal record of two convictions in connection with narcotics. He had been convicted of federal narcotics crimes in the District of Massachusetts and in the Southern District of New York. He admitted that he had met Mattera, Salvy and Peller at various times and places, including Hector's. But the sum and substance of his testimony was that all of the conversations were completely innocent; that narcotics were never mentioned, directly or indirectly; that the conversations related to all sorts of general subjects. He took the position that, while he had met all of the persons mentioned by Mattera at the times and places mentioned by Mattera, the conversations which Mattera testified to did not take place.

In rebuttal, the Government recalled Agent Enright to the stand. He testified that on December 8, 1955, Assistant United States Attorney Donahue called a conference at the United States attorney's office, at which were present Agent Enright and Group Leader Roder, and that Mr. Donahue instructed them to locate the special employee in connection with the forthcoming trial of United States v. Peltz, Peller and Torraco.

Agent Enright testified that he made efforts to locate the special employee since the date of those instructions on December 8, 1955. He described the efforts as including a visit to the special employee's former residence. The special employee was not there and had left no forwarding address. Enright visited former haunts of the special employee, such as various named bars and grills and restaurants. Enright testified that other agents of the Bureau of Narcotics who knew the special employee had also been looking for him; and that the Bureau of Narcotics had not been able to locate the special employee.

As stated, the jury found the defendant Peltz guilty on the three counts of the indictment. Upon this motion for a new trial, the defendant Peltz has submitted various affidavits, including two affidavits by Salvatore Spitale, who was the special employee. The first affidavit of Spitale is sworn to September 26, 1956; the second affidavit is sworn to October 25, 1956.

In support of the motion, the defendant Peltz has also submitted his own affidavit sworn to November 6, 1956; three affidavits by Mr. Delaney, defense counsel, sworn to November 13, 1956, November 26, 1956; and January 3, 1957, an affidavit of Mr. Delaney's partner, Peter J. Donoghue, sworn to January 3, 1957.

Pursuant to the arrangements set forth in the transcribed minutes of the oral argument of the motion, there was obtained an affidavit of Michael Peller, sworn to November 20, 1956, which is part of the record. The Government has submitted through Assistant United States Attorney Donahue, Mr. Donahue's affidavits, sworn to October 19, 1956, and November 20, 1956, and two exhibits which are attached to a letter of transmittal dated January 4, 1957, Exhibit A being a record of the criminal convictions of Salvatore Spitale, Michael Peller and Dorothy Turner, and Exhibit B being the aforementioned affidavit of Michael Peller, sworn to November 20, 1956.

Upon the concluding arguments had in open court this morning, Mr. Delaney, defense counsel, stated (Record, p. 1071)

"Primarily, if the Court please, the motion is based upon the affidavit of Salvatore Spitale, which affidavit was sworn to by him on September 26, 1956."

The Court will, nevertheless, consider all of the evidence which has been adduced upon the hearing.

The testimony of a so-called special employee of the Bureau of Narcotics should be scrutinized, particularly on a motion for a new trial which is based upon a convicted defendant's contention that the special employee's exculpatory testimony is newly discovered. Anyone familiar with criminal law enforcement in the field of narcotics knows the part played by these civilian undercover informers. The Bureau of Narcotics is compelled to use them because of the nature of narcotic crimes and the difficulty in investigating and detecting them. Many of these informers, like Spitale, have criminal records and contacts in the underworld. Some have been or are drug addicts. By their very character and background, they are suspect and vulnerable to approaches by the underworld or threats by the underworld once their function and identity become known.

If, therefore, a narcotic conviction which has not been appealed from is to be impeached upon the basis of the allegedly newly discovered testimony of a special employee who takes the stand on behalf of a convicted narcotics defendant, the Court must make a close and careful evaluation of the motives, background and associations of the infor-

mer where, in effect, he has assumed the dual role of informing against the defendant and the narcotic agents.

In many of the narcotic cases coming before the courts for trial, such type of special employee has necessarily been utilized. It would be establishing a tempting and dangerous invitation to convicted narcotics defendants to approach such informers if the courts were lightly to entertain motions for new trials predicated upon so-called newly discovered evidence emanating from such special employees. This is especially so where, as here, it appears that the special employee was a boyhood friend of Michael Peller, one of the defendants; a 10-year acquaintance of Harry Peltz, the convicted defendant; and where, as here, there are unsatisfactorily explained circumstances as to how the special employee established contact with Peltz's attorney who then makes a motion for a new trial based primarily upon the affidavit of the special employee.

These general observations furnish a frame of reference within which the testimony of Salvatore Spitale, the special employee, must be appraised.

Spitale took the stand before the Court and testified at great length, as the transcript indicates. The Court observed his demeanor closely, scrutinized the manner of his testifying, and made every effort to determine and weigh the reliability and credibility of Spitale's testimony. This is not to suggest that the ultimate determination of this motion rests solely upon considerations of relative credibility. The controlling principles of law will be set forth later in this opinion.

Spitale testified that he had used so many different aliases that he could not remember all of them; that he had used about twenty different aliases, including such names as Spencer, Soto, Salvy, Sam Salvin, James Martin, and Jim Adams.

His criminal record consists of a conviction for unlawful entry in 1914, for which he received a one-year suspended sentence.

In 1939, he was convicted of grand larceny in the first degree. He received a sentence of five to ten years. He served approximately six years.

In 1948, upon his having been found guilty of violating the conditions of parole, he went back and served approximately twenty-three months.

In addition to the foregoing record of crimes to which he had pleaded guilty or of which he had been found guilty, Spitale testified that he had engaged in the illicit whiskey business during Prohibition. At one time he was interested in a speakeasy. For many years, from about 1929 until about two years ago, he engaged in rather widespread gambling activities in connection with horses and craps. For many years, he had no source of income, except through gambling. At one time he had, to use the argot of the underworld, a piece of a book.

He filed a false income tax return, showing income from a legitimate business, although, in fact, the money had been earned from gambling. The evidence establishes that he furnished a false application for a pistol permit.

It is, of course, the law that the fact that a person has a criminal record does not disqualify him as a witness, although the criminal record bears upon his credibility.

Spitale testified that he began working for the Bureau of Narcotics in 1953 or 1954. It is clear that he worked for the Bureau of Narcotics in 1953, 1954, and up to December, 1955. He received about $12,000 from the Bureau of Narcotics during those three years as rewards and compensation for information and services.

He testified that he knew Peltz as "Harry" for about ten years (Record, p. 300). He testified that he knew Peller since they were together in Dannemora in 1946 (Record, p. 175). Peller testified that they had been boyhood friends and that Peller had also known Spitale's mother.

On or about November 9, 1955, Spitale went to San Francisco, California, and

he began working for the Bureau of Narcotics there and in Los Angeles. It is significant that Spitale's own testimony is that he was sent to California at his own request, or, as Spitale puts it, he "asked to go anywhere" (Record, pp. 499–500). He worked there about 20-odd days during the period from about November 11, 1955 to November 30, 1955, and he testified that he came back to New York in December, 1955, or sometime around the first week of December, 1955, and that it might be a week either way (Record, pp. 141–144, 147, 500–501).

After he returned to New York he did not see any narcotic agents (Record, pages 158, 387).

Spitale's memory was patently defective on dates and other details which might lend themselves to verification. He testified that there were quite a number of things he would like to forget and that he was able to forget the things that he wanted to forget (see, for example, pages 448, 488, 489–491).

He impressed the Court as utterly unreliable, unworthy of belief, and as representing the almost absolute zero of credibility. It is inconceivable to the Court that any jury would place credence in anything to which Spitale might testify.

He said he signed the moving affidavit in May, 1956, in the spring of 1956 (see, for example, pages 271, 279, 323), and that he had met Peltz' attorney a week before he signed the affidavit (pages 278, 291, 322, 325). The record shows that the first affidavit signed by Spitale was sworn to September 26, 1956.

He testified concerning the manner in which he had established contact with the defendant's attorney as follows: he had met somebody in Hector's Restaurant in April or May, 1956; this person told him that Peltz had been tried and convicted, whereupon Spitale remarked that an injustice had been done, because Peltz had not been mixed up with narcotics. Thereupon this other individual suggested that Spitale should look up Peltz' attorney. Spitale testifies that

that was the first time that he had learned that Peltz had been arrested or convicted.

The Court is of the unqualified opinion that Spitale flagrantly lied when he testified that the first time he learned that Peltz had been arrested or convicted was in April or May, 1956.

The Court accepts Agent Mattera's testimony that Spitale had been told on or about June 26, 1955, which was before the arrest of Peller and Peltz, that Peltz was going to be arrested; and that at that time Spitale made no comment, protest or remark to indicate that Spitale thought that Peltz was innocent or that Peltz should not be arrested.

Spitale's testimony as to how he learned, allegedly in April or May, 1956, that Peltz had been arrested or convicted is most unsatisfactory.

Thus, at pages 172 to 173, when Spitale was asked, "Who told you Peltz had been convicted?" he replied, "I don't know, Somebody at the table," referring to the table in Hector's Restaurant.

"Q. What was the name of the person who gave you that information?

"A. If I knew, I would tell you. I don't know the name. I don't remember the name. It could be Harry James. That is all we know people as, by their first names."

At page 283 Spitale testified in response to the question:

"Q. Can you recall the name of that individual? A. No, I cannot. Quite a few of them there.

"The Court: No, he isn't asking you about a few.

"The Witness: I am sorry, I cannot.

"The Court: Just a minute, now. He is asking you about a particular man. Do you understand the question?

"The Witness: Yes.

"The Court: That is the man he wants to know about.

"The Witness: No, I cannot.

"The Court: Do you know his first name?

"The Witness: I think it was Jimmy."

The Court is of the opinion that the foregoing testimony of Spitale is a fabrication.

At page 285 Spitale testified that, after he told "Jimmy" that Peltz had nothing to do with it, Jimmy said, "Why don't you tell that to his lawyer?"

Whereupon Spitale said, "I don't know who his lawyer is."

Jimmy said, "I believe it's Mr. Delaney. He is over on 47th Street and Fifth Avenue.

"I says, 'Well, I don't know his office.'"

Jimmy said, "'I know he goes to that bar on Third Avenue, a restaurant on Third Avenue,' and he gave me the name."

At page 287 Spitale admitted that he had seen this man once every two or three months for 10 years at various places, but that he did not even know his nickname.

He did admit at pages 310 to 311 that this person by the name of Jimmy had been present at some of the conversations at which were also present Peller and Peltz and Spitale, saying that Jimmy was there "quite a few times." But then he switched his testimony to say, "He might have been there once."

Reverting to Spitale's testimony of his alleged lack of knowledge of Peltz' arrest or conviction, when pressed as to whether or not he had been told by Mattera or any other agent about the arrest having taken place, Spitale said that he did not remember whether Mattera or any other agent had told him that Peltz had been arrested for narcotics, and that he could not positively deny that he had been told that Peltz had been arrested (pages 360–361, 411, 488).

It would unduly lengthen this opinion to go through each and every aspect of Spitale's testimony. He testified, for example, that on quite a number of occasions Peller, Peltz and he would be together; on other occasions various other persons together with Peltz had been present. He described various meetings and conversations, and according to Spitale each and everyone of these numerous conversations dealt with the weather, baseball games, politics, the nice clothing that somebody was wearing, and inconsequential subjects.

Spitale's testimony taxes the Court's credulity to the breaking point.

He testified he did not know when he first met Peltz and his memory was equally vague as to the genesis of his acquaintanceship with Peltz. Although he said he knew Peltz for about 10 years, he stuck to his story that he never spoke to Peltz except about horses, weather and clothes, or other similar subjects.

Were Spitale to testify at a new trial, there is not the slightest likelihood that his testimony would have the probable effect of producing a verdict of acquittal or of substantially influencing a jury in favor of the defendant Peltz.

We now come to a consideration of the testimony of the defendant Peltz, who took the stand at this hearing in connection with the motion for a new trial as he did on the original trial.

Upon the original trial, as upon the hearing of this motion, the Court closely observed the demeanor and manner of testifying of the defendant Peltz.

Upon the trial, in view of the fact that there was an issue of credibility involved, the Court scrupulously refrained in its charge to the jury from commenting on any phase of the evidence, lest, in spite of the most careful instructions, the jury might possibly be influenced by some comment on the part of the Court.

Now that there has been a conviction, the Court desires to state for the record that upon the trial Peltz impressed the Court as a person without conscience and without the slightest regard for the sanctity of the oath. He is a hardened criminal. He exhibited the capacity to twist and turn his testimony to suit the exigencies of each question with a blandness and nonchalance that bespeak consummate skill.

The Court did not believe his testimony at the trial and does not believe his testimony upon this hearing.

The Court will not detail Peltz' criminal record. It is all spread forth upon the minutes of the sentence proceedings.

One or two items will suffice to show the caliber of Peltz as a witness.

Upon the hearing he testified that the first effort he made to locate Spitale was the weekend before the trial began on January 3, 1956, or, as he puts it, approximately two days before the trial. He contradicted this testimony when he was shown his affidavit and also, under further questioning, when he testified that he first tried to locate Spitale about a week after June 31, 1955, and that he continued to do so for the next six months. At another point, he testified that he tried almost daily to locate Spitale from about the first week in December, 1955. Although he had learned from Peller in July or August, 1955, that Spitale had lived at the Great Northern Hotel, he did not go to the Great Northern Hotel to look for Spitale until five or six months later, toward the end of December, 1955.

He testified that he had been framed by Agent Mattera; and that during the trial his fiancee, Dolly Turner, had offered to take the stand and to contradict Mattera. However, in order to avoid embarrassing Dolly Turner, Peltz did not accept her offer.

When asked whether he had informed his attorney, who was trying the case, that Dolly Turner was willing to take the stand and to contradict and refute Mattera's testimony, Peltz stated that he did not even tell his attorney about Dolly Turner's offer.

The Court does not believe this testimony; it is utterly incredible.

He admitted that the statement in his affidavit that, since the summer of 1954, he had not seen Salvatore Spitale was incorrect, but he said that that was a typographical error.

We now come to a consideration of the testimony of the witness Dorothy Stirrat, who testified before the Court on this motion. Dorothy Stirrat has also used the following aliases: Sally Williams, Mary Earle, Dolly Turner and Hazel Wood. She was convicted of petit larceny in 1929, shoplifting in 1932, and robbery in the first degree in 1940. For the latter crime she was sentenced to serve a term of from 10 to 30 years.

She testified that she knew Peller for 30 years, that she knew Peltz for about 30 years; that at one time she was planning to marry the defendant Peltz; that marriage plans were first made in the Christmas season of 1951; that she considered herself Peltz' fiancee, and that, although the marriage plans apparently "petered out" in 1953, as she puts it, she still regards herself as engaged to Peltz, and she regards herself as a good friend of Peltz.

She represents an underworld character of the worst type. Her "blackbook" of names, telephone numbers and addresses shows her to be the friend of a number of persons who, according to her own testimony, had been dealers in narcotics.

She testified that she offered to take the stand in behalf of Peltz during the trial and to refute Mattera's testimony as to the alleged conversation in Hector's Restaurant at which she was present, and where according to Mattera, narcotics was discussed by Peltz.

Assuming that she made such an offer to Peltz, as both Peltz and she testified to, it is clear that her testimony is not "newly discovered". For, on the basis of the uncontradicted testimony even as adduced in behalf of the defense, her testimony was available during the trial.

By virtue of her record, by virtue of her close friendship with Peltz and by virtue of the fact that her testimony is not newly discovered, her testimony is of no value for purposes of the present motion.

In the moving affidavit of Peter J. Donoghue, sworn to January 3, 1957, referring to Dorothy Stirrat's informa-

tion to Mr. Donoghue, the following statement appears:

"Miss Stirrat also advised me that at or about the time of her arrest the United States narcotic agent told her in effect that she was in serious trouble, but that if she could help the United States Bureau of Narcotics, he might be able to help her."

That is a rather ambiguous statement. It is equivocal and might possibly give rise to the inference that some sort of a deal was suggested by the narcotic agents to Miss Stirrat that if she supported the narcotic agent's version of the case, the narcotic agent might help her. But, be that as it may, upon the trial she testified that the narcotic agents never asked her to lie and that, in fact, they had questioned her closely about information concerning narcotic dealers and various persons, whose names were read to her from a list. The names appear in the record; and no purpose would be served by listing them in this opinion.

It is crystal clear that no improper suggestions were made by the narcotic agents, Agent Rudden and another agent, who interviewed Dorothy Stirrat.

We now come to the testimony of Michael Peller. Peller has been an opium smoker for forty years. He has a criminal record that goes back to 1912, when he was sentenced to two years in the State prison for grand larceny.

In 1917, he was sentenced to an indefinite term in the penitentiary for larceny.

In 1924, he received an 18-month sentence for possession of narcotics.

In 1932 or 1933, he was found guilty of possession of an opium pipe.

In 1938 or 1939, he was sentenced to Fort Leavenworth for a year and a day on a Federal narcotics charge arising out of possession of opium or an opium pipe.

As a result of proceedings in the State courts, commenced in or about 1942, he eventually pleaded guilty in 1946 to manslaughter, for which he received a sentence of seven to eight years.

As already stated, he pleaded guilty to Counts 1 and 3 in this case.

Peller has taken the stand on this motion and has given testimony which is exculpatory of Peltz. Peller testified, in substance, that at no time during any of the conversations between or in the presence of Mattera, Spitale, Dolly Turner, or any other person, was the word narcotics ever mentioned in the presence of Peltz.

Before the Court considers the details of Peller's testimony, it is important to point out that the defense has not shown that Peller's exculpatory evidence could not have been offered at the trial if the Peltz defense had then thought it worth while and had used diligence.

If, as claimed, Peltz and his attorney knew that Peller was in position to give exculpatory testimony in favor of Peltz by contradicting Agent Mattera, then it was incumbent upon Peltz and his attorney to make a reasonable effort to get Peller's testimony before the jury. The only alleged stumbling block was Peller's and Peller's attorney's position, allegedly expressed to Peltz and Peltz's attorney, that if Peller were put on the stand in behalf of Peltz, he would claim his privilege notwithstanding the fact that Peller had pleaded guilty to Counts 1 and 3 of the indictment at the opening of the trial on January 3, 1956.

There is some authority for the proposition that where a defendant has pleaded guilty to an indictment, his plea of guilty constitutes a judicial admission of guilt with respect to the specific crime set forth in the particular indictment. According to such authority, a plea of guilty under such circumstances operates as a waiver of the defendant's constitutional privilege which he might have otherwise exercised to refuse to answer questions, the answers to which would incriminate or tend to incriminate him with respect to the specific crime for which he had pleaded guilty. See Krogmann v. U. S., 6 Cir., 1955, 225 F.2d 220–226.

It is unnecessary for this Court to rely upon or to express any opinion with

respect to the foregoing proposition of law, in view of the following facts in this case. Peltz's attorney argues that, until Peller was sentenced, Peller could have moved to change his guilty plea and that until Peller was sentenced there was no judgment of conviction. Let us assume, *arguendo,* that such argument is valid. The official entries in the Clerk's files and records show that on January 3, 1956, the sentencing of Peller was set down for January 6, 1956, at 10:45 a. m. On January 5, 1956, the Court ordered a presentence report for Peller and adjourned the sentencing to January 18, 1956. As stated, this trial commenced on January 3, 1956.

Had Peltz's attorney indicated at any time to the Court that, in the interest of justice, he desired to have Peller's testimony in behalf of Peltz, Peller's alleged objection—that he would claim his constitutional privilege—could have readily been obviated by simply having the sentence proceed on January 6, 1956, as originally scheduled and having a presentence report prepared immediately. Instead, the defense strategy was to proceed without Peller's testimony.

The Court will not speculate as to why Peller did not want to testify in behalf of Peltz prior to Peller's being sentenced.

■ Peller's allegedly exculpatory story was and is not, in fact, "newly discovered", even according to Peltz's attorney, who argues that it is now newly available and hence, in legal effect, equivalent to newly discovered. The Court's view is that, by the exercise of due diligence, Peller's exculpatory testimony, for whatever it may be worth, could have been available to Peltz at the trial if it had been genuinely desired. The Peltz defense strategy with respect to Peltz's alleged story of Peltz's innocence conforms with the defense strategy with respect to Turner's alleged story of Peltz's innocence, that is, to put it in deep freeze. The Peller and Turner stories have now been defrosted for purposes of this motion for a new trial.

According to the official transcript of the proceedings, on January 3, 1956, which is part of the Clerk's file, Peller stated, in response to the Court's question, that he had read the entire indictment. However, upon the hearing of this motion, Peller testified that he had not read the indictment. He did, however, admit that the indictment had been explained and read to him.

Peller pleaded guilty on January 3, 1956, to Counts 1 and 3 of the indictment which not only named Peller as a defendant, but also Peltz. The third count to which Peller pleaded guilty charged a conspiracy between Peller and Peltz. By pleading guilty to the conspiracy count, Peller admitted in open court that he was guilty of conspiring *with Peltz.* This judicial admission does not square with Peller's present story that Peltz has nothing to do with him and narcotics.

■ Of course, Peller's plea of guilty is not binding on Peltz. The Court adverts to Peller's plea of guilty to the third count as bearing upon Peller's credibility when he states that Peltz had nothing to do with him in the narcotics business.

In his testimony upon this hearing, Peller clearly demonstrated that he was utterly unreliable and unworthy of the slightest belief. In the Court's opinion, the oath means nothing to him. He is a hardened and vicious criminal who would change his testimony to suit the exigencies of any situation. No reasonable person on or off a jury would accept his word for anything.

His testimony about purchasing $5,500 worth of narcotics *on credit* from one "Shorty" whom he had not seen in 19 years is incredible.

He could not remember whether his sale of the narcotics to Mattera for $5,500 took place in March or April, 1954, or August, 1954.

The Court will not detail the testimony concerning his employment at Fada Radio & Television Company. He testified that he had been employed there every day from September, 1950 to April, 1955. The indisputable documentary proof contradicts his testimony. His

memory was completely unreliable as to when he was operated upon, when he went into the hospital, when he was employed, when he was unemployed, and similar matters.

His testimony as to his residence was not truthful.

His testimony, which he puts in positive form, that Peltz was not present with him in Hector's Restaurant at the early morning meeting on August 21, 1954, is refuted by Agent Dukas.

He admitted that his testimony, that he was not married during the period of time referred to in a question, was wrong.

He would have the Court believe that he handled a narcotic transaction for $5,500 and that he refused a $200 commission which was offered to him, at a time when he was unemployed and receiving unemployment insurance.

The most fantastic tale is Peller's testimony as to how he and Spitale handled the distribution of the $5,500.

He says that they sat at a table in the front part of Hector's Cafeteria, in the second row of tables from the front window, a window through which passersby can readily look, and that he handed the $5,500 in cash (in tens, twenties, fifties and hundreds), to Spitale. The money was not in an envelope or covering, and the $5,500 in greenbacks was passed across the top of the table. He then testified that Spitale gave him $5,000, after Spitale counted out the $5,000, and that Spitale kept $500. He had previously testified that he was suspicious about being seen with Spitale in Hector's, and that he did not want to be seen in company with Spitale by any persons in the cafeteria who were known to him.

In sum, the evidence adduced in behalf of Peltz is most unimpressive, is completely lacking in substance, credibility or reliability, and has not the slightest persuasive or probative value, and would in the Court's view have not the slightest effect upon a jury in demonstrating Peltz' innocence.

With respect to one other phase of the matter, the Court desires to state that there is no reason to believe that either the prosecutor or the narcotic agents were engaged in an attempt to keep Spitale away from the trial. Spitale testified that he himself was the one who wanted to get out of New York, and that it was at his suggestion that he was sent to California, where he worked for the Bureau of Narcotics.

The proof shows that he came back to New York in December of 1955. The proof convincingly establishes that on December 8, 1955, instructions were given to locate Spitale.

Agent Enright's testimony and Group Leader Roder's testimony to the effect that they made efforts beginning December 8th to locate Spitale is impressive and convincing, and the Court accepts the testimony as completely reliable.

It is true that the New York Bureau of Narcotics office did not get in touch with the California office. But in the light of the evidence, although such an inquiry might have well been made as an obvious step in the investigation, Spitale was no longer in California. Any such inquiry would have been fruitless, had it been made.

The charge leveled against the Bureau of Narcotics in defense counsel's concluding argument—that there was a wilful and deliberate attempt on the part of the narcotics agents to keep Spitale away from the trial—is unjustified. That charge is not supported by the evidence; it is an unwarranted attack on these narcotic agents; and it is rejected by the Court. These agents have impressed the Court with their sincerity and their devotion to duty. They have been reliable witnesses in this proceeding.

The Court vividly recalls Agent Mattera's testimony at the trial. The Court states that Agent Mattera impressed the Court as being a truthful and reliable witness.

The vital elements that must be shown by a party seeking a new trial

on the ground of newly discovered evidence, Federal Rules of Criminal Procedure, Rule 33, have been frequently expounded by the courts. United States v. On Lee, 2 Cir., 1953, 201 F.2d 722; United States v. Hiss, D.C.S.D.N.Y.1952, 107 F.Supp. 128, 136, affirmed 2 Cir., 201 F.2d 372, certiorari denied 1953, 345 U.S. 942, 73 S.Ct. 830, 97 L.Ed. 1368; United States v. Rutkin, 3 Cir., 1953, 208 F.2d 647, 649; Johnson v. U. S., 8 Cir., 1929, 32 F.2d 127, 130; Hamilton v. U. S., 1944, 78 U.S.App.D.C. 316, 140 F.2d 679; Coates v. United States, 1949, 84 U.S.App.D.C. 359, 174 F.2d 959.

In the On Lee case supra, Chief Judge Swan said, 201 F.2d 723:

"A motion for a new trial on the ground of newly discovered evidence is addressed to the discretion of the trial judge. In deciding it he may utilize the knowledge he gained from presiding at the trial as well as the showing made on the motion."

Chief Judge Swan added, 201 F.2d 723, note 3:

"It is generally said that five requirements should be met before a new trial will be awarded on the grounds of newly discovered evidence. See the statement of Johnson v. United States, 8 Cir., 32 F.2d 127, 130, quoted in Brandon v. United States, 9 Cir., 190 F.2d 175, 178: '* * * (a) The evidence must be in fact, newly discovered, i. e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on, must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.' "

On a motion for a new trial on the grounds of newly discovered evidence it is. among other things, incumbent upon the moving party to offer new matter which, if true, would "probably" produce an acquittal. United States v. On Lee, supra; Wolcher v. U. S., 9 Cir., 1956, 233 F.2d 748, 751, citing Balestreri v. U. S., 9 Cir., 1955, 224 F.2d 915, and United States v. Johnson, 7 Cir., 1944, 142 F.2d 588, petition for certiorari dismissed 1944, 323 U.S. 806, 65 S.Ct. 264, 89 L.Ed. 643. See Davis v. Yellow Cab Co., 5 Cir., 1955, 220 F.2d 790, 791–792.

 After a full and close analysis and consideration of all that the defendant has offered, the Court is of the opinion that the defendant Peltz has failed to establish a record of evidence that satisfies the basic requirements set forth in the authorities cited above. The defendant Peltz is not entitled to a new trial.

There is no newly discovered evidence which would justify the conclusion that, if it were presented to a jury, it would probably result in a verdict of acquittal.

Defendant's showing does not have the substance which should invoke the exercise of judicial discretion in his favor on this motion. The motion is denied.