**UNITED STATES of America**

v.

**James WEST, Andrew Remes, Hyman Lumer, Sam Reed, Eric Reinthaler, Marie Reed Haug and Fred Haug.**

**Cr. No. 22230.**

United States District Court
N. D. Ohio, E. D.

Feb. 4, 1959.

See also 21 F.R.D. 22.

202

Sumner Canary, U. S. Atty., Cleveland, Ohio, Herbert G. Schoepke, William Greenhalgh, Dept. of Justice, Washington, D. C., for the United States.

Chester K. Gillespie, Cleveland, Ohio, for West.

Paul J. Gnau, Cleveland, Ohio, for Remes.

Alan D. Sophrin, Cuyahoga Falls, Ohio, for Lumer.

Henry P. Kosling, Youngstown, Ohio, for Reed.

Fred Mandel, Cleveland, Ohio, for Marie Reed Haug and Fred Haug.

Frank J. Donner, New York City, for Reinthaler.

Victor Rabinowitz, New York City, Ann F. Ginger, for West, Remes, Lumer and Reed.

WEICK, District Judge.

The seven defendants were convicted by a jury on the charge of conspiracy to file false non-Communist affidavits of union officers with the National Labor Relations Board. Title 18 U.S.C. §§ 371, 1001; 29 U.S.C.A. § 159(h). Motions for a new trial or for judgment of acquittal were overruled. The defendants have prosecuted appeals to the Court of Appeals for the Sixth Circuit and have been released on bond pending appeal.

During the pendency of their appeals, the defendants filed in this Court a motion for a new trial on the ground of newly discovered evidence under Rule 33 of the Federal Rules of Criminal Procedure, 18 U.S.C.A. They have also filed a Supplementary Motion under Rule 33 and Petition under Title 28 U.S.C. § 2255 which they claim should be treated as invoking the extraordinary remedy of *Coram Nobis*.

Prior to the adoption of Rule 33, the District Court had no jurisdiction to hear and determine a motion for a new trial in a criminal case during the pendency of the case in the Court of Appeals. Under Rule II(3) of the Rules, Practice and Procedure (292 U.S. 662), such a motion could only be entertained by the District Court after the remand of the case from the Court of Appeals. Levinson v. United States, 6 Cir., 1929, 32 F.2d 449; Hamel v. United States, 6 Cir., 1943, 135 F.2d 969.

The substantial question is whether this necessity for remand has been perpetuated by Rule 33 which provides:

"A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after a final judgment, but if an appeal is pending the court *may grant* the motion only on remand of the case." (Emphasis added.)

The Court of Appeals for the Ninth Circuit, commenting on this change in terminology stated:

"It will be noted that a change from *entertain* to *grant* was made in the rule. This change requires that an application for a new trial on the ground of newly discovered evidence first be made to the district court. If that court signifies a willingness to grant the motion then this court will remand for that purpose." Zamloch v. United States, 1951, 187 F.2d 854, 855.

Jurisdiction of the District Court to hear a motion under Rule 33 without first obtaining remand was recognized in Smith v. Pollin, 1952, 90 U.S.App.D.C. 178, 194 F.2d 349, 350, wherein the viewpoint of the Advisory Committee on the effect of the change in the rule was set forth.

"Under the proposed rule a motion for a new trial could be made without securing a remand. If,

however, the trial court decides to grant the motion, prior to the entry of the order granting it, a remand will have to be obtained. This course will eliminate the need of a remand in those cases in which the trial court determines to deny a motion for new trial." Federal Rules of Criminal Procedure p. 131 (2nd Preliminary Draft).

See also Knight v. United States, 5 Cir., 1954, 213 F.2d 699; United States v. Minkoff, 2 Cir., 1950, 181 F.2d 538; Rakes v. United States, 4 Cir., 1947, 163 F.2d 771.

This exact question has not been passed upon by the Sixth Circuit Court of Appeals. However, the recent decision in Herring v. Kennedy-Herring Hardware Co., Inc., 261 F.2d 202, indicates the approval of that Court of the procedure just discussed, and states that motions for a new trial should be addressed to the District Court.

■ The District Court, therefore, has jurisdiction to hear the motion and need not secure a remand of the case unless it determines to grant the motion.

■ The remedy sought by defendants under Title 28 U.S.C. § 2255 is available only to persons who are "in custody." Rowland v. State of Arkansas, 8 Cir., 1950, 179 F.2d 709, certiorari denied 339 U.S. 952, 70 S.Ct. 841, 94 L.Ed. 1365; United States v. Young, D.C.W.D. Wash.1950, 93 F.Supp. 76.

The defendants, in the present case, are not in custody. They are out on bond. Hence Title 28 U.S.C. § 2255 is not applicable.

Defendants contend that notwithstanding the fact that this motion cannot be considered under Section 2255, this Court should follow the decision in Shelton v. United States, 5 Cir., 1957, 242 F. 2d 101, and consider it in the nature of an application for a Writ of Coram Nobis.

■ The function of Coram Nobis is to bring to the attention of the court some fact unknown to the court, which if known would have resulted in a different judgment. Allen v. United States, 6 Cir., 1947, 162 F.2d 193.

Until recent years there was considerable doubt whether this writ was available in the federal courts, as it was generally considered obsolete. 24 C.J.S. Criminal Law § 1606a. By its decision in United States v. Morgan, 1953, 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248, the Supreme Court held Coram Nobis still lives. Four Justices dissented, pointing out that the majority had resurrected the ancient writ from the limbo to which it had presumably been relegated. Supra, 346 U.S. at page 513, 74 S.Ct. at page 253. Counsel for defendants rely on the Morgan case in support of their contention that Coram Nobis is available to them.

■ There is one basic distinction between Shelton and Morgan and the case at bar. In both Shelton and Morgan the only remedy available to review the judgment under attack was to treat the motion under Section 2255 as a proceeding in the nature of Coram Nobis. Here, defendants have obtained review of the factual issues of which they complain by the motion for new trial under Rule 33 of the Federal Rules of Criminal Procedure. Hence, it is not necessary for them to resort to Coram Nobis.

■ Coram Nobis will not lie where there is another adequate remedy, as by motion for a new trial. United States v. Mayer, 1914, 235 U.S. 55, 69, 35 S.Ct. 16, 59 L.Ed. 129; 24 C.J.S. Criminal Law § 1606b(3). The extraordinary nature of this remedy was emphasized by Justice Jackson in United States v. Smith, 1947, 331 U.S. 469, 475, note 4, 67 S.Ct. 1330, 1334, 91 L.Ed. 1610, when he stated:

"It is difficult to conceive of a situation in a federal criminal case today where that remedy [coram nobis] would be necessary or appropriate."

■ Defendants not only have a plain and adequate remedy under Rule 33 of the Criminal Rules, but have utilized it to the utmost. The important thing is

that the defendants have been given a hearing on their motion and all their claims have been considered. So long as they have a remedy in this case, it is really immaterial what it is labelled. Cf. United States v. Derosier, D.C.W.D. Pa.1956, 141 F.Supp. 397, 401.

This brings us to a consideration of the merits of the motion.

A hearing was held in open court for three and one-half days and witnesses were examined under oath and documents received in evidence. Briefs were filed by the defendants before and after the hearing.

The principal complaint of the defendants was that the Government witness Fred Leonard Gardner gave untruthful testimony at the trial when he testified, on cross-examination, to the effect that he had never been in the armed services. It is claimed that he gave false testimony in order to conceal his record of desertion from the army.

No question relating to his military service had been asked of the witness on direct examination.

The specific question asked of Gardner on cross-examination at the trial was negative in form and was answered in the negative as follows:

"Q. You have never been in the armed forces? A. No, Sir." (Trans. p. 896.)

Gardner's explanation of his answer was that he thought that the question propounded to him on cross-examination related to whether he had been in the Armed Forces in World War II. He had not served in that war.

The evidence offered at the hearing on the motion was to the effect that Gardner had voluntarily enlisted in the Army on January 25, 1922, at the age of 15 and served until he was discharged on May 30, 1925. He accomplished this by mis-stating his date of birth as December 13, 1903, instead of the true date of birth which was July 13, 1906.

The Army records reveal that Gardner was absent without leave from February 14, 1924, until March 22, 1924. He was tried by court martial and sentenced to be confined at hard labor for two months and to forfeit $20 a month salary for said period. The Army records further disclose that his character was excellent.

Gardner reenlisted in the Army on January 21, 1926 and was assigned to a school at Fort Riley, Kansas. The records reflect that he deserted on May 11, 1926 and never returned, but that he is not now wanted as a deserter.

Gardner testified at the hearing that he had registered for the draft in World War II and had filed a questionnaire with his Local Selective Service Board; that he was employed at that time by the United Electrical Radio and Machine Workers of America, hereinafter referred to as U. E. He had served the Union as organizer, business representative and international representative.

He testified that U. E. handled his case before the Local Board and filed with the Board the necessary papers to establish that his work for the Union was essential to the war effort and resulted in his deferment.

Gardner further testified that in 1944 he consulted with David Scribner with respect to clearing up his service record in World War I. Mr. Scribner at that time was general counsel for U. E. Mr. Scribner was also one of counsel for the defendants, Marie Reed Haug and Fred Haug in the case at bar.

Gardner further testified, in substance, that he called Scribner in New York from Fort Wayne, Indiana and informed Scribner about his Army record and sought his advice as to getting the record cleared up; that Scribner advised him not to do anything about it; that he visited Scribner later at his office in the Union Headquarters in New York and brought up the subject again and Scribner advised him to forget it.

Mr. Scribner categorically denied that he had the conversation or had given any advice to Gardner concerning his military record or that he ever had any knowledge concerning his service record.

There were no witnesses to the telephone conversation or the visit in New York.

The claimed conversations between Scribner and Gardner took place about 15 years ago. They would be more important for Gardner to remember than Scribner who was a busy man and not as directly affected with the matter. There would certainly be nothing unusual for Gardner to take up such a problem with the general counsel of the Union, particularly since the Union was handling Gardner's draft deferment in proceedings before the Local Board.

Giving to both Gardner and Scribner the benefit of any doubt, it is obvious that Gardner at least was under the belief that Scribner knew all about his military record and for that reason it is not likely that Gardner would attempt to conceal and falsely testify to something which he believed was within Scribner's knowledge.

There is substantial evidence in the record corroborating other portions of Gardner's explanation.

Albert J. Fitzgerald, President of U. E., testified that he was in charge of the manpower program of the Union during World War II and formulated its deferment policies; that he had discussed the program with the general counsel for the Union, Mr. Scribner, and also with his assistant Livingston; that he was personally aquainted with Mr. Gardner; that U. E. handled the deferments for Gardner before the Local Board.

Mr. Fitzgerald identified a U. E. file marked "Memorandum of Essential Officers and Representatives of United Electrical Radio and Machine Workers of America. (Gardner)" In the file there is contained copies of correspondence of the U. E. with the Local Board, Gardner, and with General Hershey relative to the deferment of U. E. personnel generally and Gardner particularly.

Mr. Scribner testified that he was not familiar with U. E.'s manpower program and did not handle any selective service matters.

Mrs. Hattie L. Polson, record clerk at the Illinois Selective Service State Headquarters, identified Gardner's registration card and his classification record. This disclosed that on October 27, 1941, he was classified by the Local Board as III-A, which was the classification available for a married man without children. Gardner was classified as I-A after Pearl Harbor; that on appeal the Board of Appeals classified him in II-A available for occupations essential to the war effort; that after his 38th birthday he was classified in II-A(h) and on October 25, 1944, in IV-A. Associate U. E. counsel Livingston notified Gardner by letter of the classification II-A(h).

U. E. could not have handled the draft case for Gardner without knowledge of at least part of his background. The Union officers Fitzgerald and Emspak denied any knowledge of Gardner's service record.

Referring to the specific question put to Gardner on cross-examination "You have never been in the Armed Forces?", Gardner should have added to his answer "No, Sir" the statement "I have been in the Armed Forces." Suppose that Gardner had so answered the question and assuming that defense counsel had no knowledge of his desertion as they claim, the matter might well have been dropped at that point. The negative question was not designed to and did not elicit information from Gardner that he had been AWOL or had deserted from the Army.

Mr. Scribner testified concerning his discovery of the evidence that after the jury verdict and before the motion for a new trial had been heard, he had received an anonymous telephone call at his New York office advising him that Gardner had been in the Army at one time and had deserted; that he, Scribner, called Alan Sophrin of Akron, one of the assigned counsel and asked him to investigate it; that Sophrin contacted his Congressman and did not obtain any information; that none of the other counsel in the case was advised of this information nor was it disclosed to the Court at the oral hearing of the original

motion for a new trial conducted on the 19th day of February, 1958.

It appears that the matter was permitted to rest until the following summer when Scribner wrote a note to Stephen Young who had been co-counsel with him for Marie Reed Haug and Fred Haug. Mr. Young contacted the office of Congressman Vanik who promptly obtained information as to Gardner's Army record. Mr. Scribner, on or about September 8, 1958, contacted the Department of Justice and the District Attorney asking them to investigate the matter. Mr. Young, who has since been elected to the United States Senate, testified that prior to this date he had no knowledge of Gardner's military service.

The reason given by Mr. Scribner for his failure to inform the Court of his knowledge at the first instance was that he did not want to disclose the information about Gardner to anyone until he had verified it as he didn't want to harm Gardner and he considered it as merely a rumor. The record does not disclose any such solicitude for Gardner during the trial.

It was stipulated that if the other counsel for defendants were called as witnesses that they would testify that they had no knowledge of Gardner's military service until after September 8, 1958 and the Court finds that they had no such knowledge.

There was no proof that the prosecution had any knowledge of Gardner's military service until September 8, 1958. This was testified to by Sumner Canary, District Attorney who was in charge of the trial of the case; two assistants assigned from the Internal Security Division of the Department of Justice, Herbert G. Schoepke and William W. Greenhalgh; David H. Harris, an attorney with the Department of Justice who presented the case to the Grand Jury; Donald E. Kelly, District Attorney in Denver, Colorado who prosecuted the case of United States v. Travis, Criminal No. 14266 (D.C., Colo.) where Gardner testified as a witness; L. E. Broome and

Cecil R. Heflin, attorneys with the Internal Security Division who had interviewed Gardner in Butte, Montana, in in 1956 and 1957; Special Agents of Federal Bureau of Investigation, Thomas H. Zoeller and Doyce E. Cochran. The excised F.B.I. report of October 7, 1958 (Defts. Ex. D) which was received at the Denver trial also establishes that the Government had no knowledge of any military service by Gardner.

There is nothing in the Grand Jury testimony of Gardner in the case at bar or in a Grand Jury proceeding in New York which the Court examined concerning his military service.

I conclude that there is no evidence as to knowledge by the Government of Gardner's military record.

█ In a proceeding under Title 28 U.S.C. § 2255 for a new trial on the ground that defendant was convicted on perjured testimony, which constitutes a collateral attack on the judgment, it is essential for the movant to establish not only the perjury, but also that the prosecution used such testimony knowingly and wilfully to obtain a conviction. Green v. United States, D.C.Mass.1958, 158 F.Supp. 804; United States v. Derosier, supra.

█ This the defendants have failed to do.

█ It is not necessary to prove such knowledge in a proceeding for a new trial under Rule 33 as this constitutes a direct attack on the judgment.

█ The granting or refusing of a motion for a new trial upon newly discovered evidence rests in the sound discretion of the court. Winer v. United States, 6 Cir., 228 F.2d 944, 945; Martin v. United States, 6 Cir., 154 F.2d 269; Gordon v. United States, 6 Cir., 178 F.2d 896; United States v. On Lee, 2 Cir., 201 F.2d 722; Casey v. United States, 9 Cir., 20 F.2d 752, affirmed 276 U.S. 413, 48 S.Ct. 373, 72 L.Ed. 632; United States v. Johnson, 7 Cir., 142 F.2d 588; United States v. Peller, D.C.N.Y.1957, 151 F. Supp. 242.

Such a motion is not favored in law and is ordinarily not granted where the newly discovered evidence is only of an impeaching character.

In Mesarosh v. United States, 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1, the Supreme Court recognized this rule stating:

"It must be remembered that we are not dealing here with a motion for a new trial initiated by the defense, under Rule 33 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., presenting untruthful statements by a Government witness subsequent to the trial as newly discovered evidence affecting his credibility at the trial. Such an allegation by the defense ordinarily will not support a motion for a new trial, because new evidence which is 'merely cumulative or impeaching'. is not, according to the often-repeated statement of the courts, an adequate basis for the grant of a new trial." 352 U.S. at page 9, 77 S.Ct. at page 5.

In Casey v. United States, supra, the Court said:

"One of the grounds upon which defendant moved for a new trial was newly discovered evidence, supported by numerous affidavits which in the main assail the character and credibility of one of the government witnesses and tend to show that she was untruthful in some of the testimony she gave. Generally the granting or refusing of a new trial is within the discretion of the court; and new trials upon this ground are not favored. Under the circumstances, defendant must have known or had good reason to anticipate that this witness would testify for the government, but there is no showing at all of diligence. *The alleged false testimony was brought out on cross-examination as to matters purely incidental and collateral.*" 20 F.2d at page 754. (Emphasis added.)

In United States v. Hiss, D.C., 107 F.Supp. 128, at page 136, the Court followed the rule in Berry v. State of Georgia, 10 Ga. 511, as to the things which must be established before the motion can be granted, namely,

(a) the evidence must be newly discovered (since trial),

(b) facts must be alleged which infer diligence on the part of the mover,

(c) the newly discovered evidence must not be merely cumulative or impeaching,

(d) Such evidence must be such that on a new trial would probably produce an acquittal. Accord: United States v. Rutkin, 3 Cir., 208 F.2d 647; United States v. Derosier, supra.

Applying this rule to the case at bar:

(a) can be said to have been established by the evidence,

(b) while there may be some question as to whether Mr. Scribner used due diligence, his failure to act cannot be imputed to counsel for the other defendants in the case. Considering his explanation, I am not willing to say that he failed to perform his duty. Under the circumstances I find that due diligence was exercised by all of the defense counsel.

(c) The evidence is solely for impeachment.

(d) The Court does not believe that the result of the trial would have been any different if the evidence had been presented at the trial.

On this basis defendants' motion under Rule 33 must fail.

Defendants allege as another ground for the granting of a new trial the failure of the Government

"to produce, pursuant to demand made at the trial, certain statements made by the witness Gardner relevant to his testimony given at the

trial, including, but not limited to statements incorporated in a certain statement or report of the F.B.I. dated Oct. 7, 1955 and other statements and reports made in the year 1955 and early in 1956 in Butte, Montana."

The Government did produce at the trial written statements signed by Gardner and a number of investigative reports made by Special Agents of the Federal Bureau of Investigation relative to their interviews with him.

It is claimed that the prosecution suppressed and did not produce the following investigative reports made by Special Agents of the Federal Bureau of Investigation concerning their interviews with Gardner at Butte, Montana:

"Special Agent W. E. Kreitner, Jr., report dated October 7, 1955, Thomas H. Zoeller, report dated November 23, 1955, Kent Hutchison, report dated March 20, 1956."

The evidence disclosed that these three investigative reports had not been furnished to the District Attorney by the Federal Bureau of Investigation, but were in Denver, Colorado for use in a criminal trial of United States v. Travis pending in the District Court there as Criminal No. 14,266. This case was tried about the same time as the case at bar and Gardner testified there also as a witness. An excised portion of the report of October 7, 1955, was received in evidence in the Travis case.

Mr. Greenhalgh testified that near the end of the case at bar he learned of the existence of these documents and requested that they be sent to Cleveland. They arrived here after the close of the evidence and while the jury was deliberating.

The District Attorney could not very well be guilty of suppressing F.B.I. investigative reports of which he had no knowledge and which he did not possess.

In Jencks v. United States, 1957, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, which is heavily relied on by the defense, paid informers made written reports to the F.B.I. When the informers were called as witnesses for the Government in the trial of a criminal case the defense was denied its right to inspect the reports, which it could have used for cross-examination and impeachment purposes.

The Supreme Court held that the defense was entitled to inspect the written reports made by the witnesses to the F.B.I. or any oral reports or statements recorded by the F.B.I. and to use them for impeachment purposes.

Jencks is readily distinguishable from the case at bar in that the Special Agents who made the reports to the F.B.I. were not called as witnesses in the trial of the case at bar and consequently their reports would be neither relevant nor material.

 Jencks does not require the Government to open its investigative files in a criminal case and permit their inspection by persons charged with crime to assist them in the preparation for their defense.

Nor does Jencks require the defendants to turn over to the prosecution their files of investigative material which they have secured for their own defense.

 It is not believed that Jencks was ever intended to sanction the disclosure of the secret proceedings of a Grand Jury or to require a lawyer to turn over to the opposition his notes which he has prepared for his own use at the trial. All of these matters were requested by the defendants at the trial of the case and at the hearing of the motion. At the latter hearing Government attorneys voluntarily produced their own notes and delivered them to counsel for defendants for their inspection.

 In Stanley v. United States, 6 Cir., 1957, 249 F.2d 64, it was held that the rule of the Jencks case only compelled disclosure of reports of F.B.I. agents who appeared as witnesses and testified at the trial as to matters contained therein. It does not require the production of reports of agents who did not testify. Accord: Papworth v. United States, 5 Cir., 1958, 256 F.2d 125; United States v.

Tomaiolo, 2 Cir., 1957, 249 F.2d 683; United States v. Grunewald, D.C.S.D. N.Y.1958, 162 F.Supp. 621; United States v. Anderson, D.C.E.D.Mo.1957, 154 F.Supp. 374; United States v. Carr, D.C.S.D.Cal.1957, 21 F.R.D. 7.

Special Agents Kreitner, Zoeller and Hutchison did not testify as witnesses in the trial so there would have been no necessity for the Government to produce their statements or reports of investigation unless they contained statements of Gardner required to be produced under Title 18 U.S.C. § 3500.

The question then remains whether the reports should have been furnished to the defendants by virtue of Title 18 U.S.C. § 3500. The answer depends on whether any of the reports constitute a "statement" of Gardner within the meaning of Section 3500(a). Statement is defined therein as:

"(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

"(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement."

■ Obviously, these reports fail to qualify under (1) as they were not signed by Gardner. He never saw them and was ignorant of their contents. Under (2), the statement must be a "substantially verbatim recital of an oral statement * * * recorded contemporaneously with the making of such oral statement" in order to qualify. As well stated by Chief Judge Moore, in United States v. Anderson, supra [154 F.Supp. 375], this category "includes only continuous, narrative statements made by the witness recorded verbatim, or nearly so, by persons acting for the United States and does not include notes made during the course of an investigation (or reports compiled therefrom) which con-

tain subjective impressions, opinions or conclusions of the person or persons making such notes."

Thomas H. Zoeller, Special Agent of the F.B.I., testified that none of these reports were verbatim or substantially verbatim recitals of oral statements made by Gardner.

The report of *October 7, 1955,* was a synthesis of two different interviews with Gardner which took place on August 31, 1955 and September 9, 1955, and covered 10 different reporting periods.

The report of *November 23, 1955,* covered two interviews with Gardner on November 4th and November 14th.

The report of *March 20, 1956,* covered interviews held on January 23rd and February 21st.

During their interviews with Gardner the Special Agents took some notes, which they do not now have, and at later dates compiled the reports from the notes which they had taken.

■ The reports appear to be summaries in the language of the agents of their interviews with Gardner.

Agent Zoeller testified that the background material on Gardner appearing in the report dated October 7, 1958, was obtained from other F.B.I. investigative files and was checked over with Gardner. It contains conclusions and impressions of the agent and might have been used to cross-examine him, had he testified.

Zoeller did not recall how or in what manner Gardner was questioned about his military service.

These reports obviously did not constitute statements of Gardner within the meaning of Section 3500 and the Government could not properly be required to produce any of them.

Since they were not statements of Gardner, they could not be used for purposes of cross-examination or impeachment.

■ The Government was not bound to furnish to defendants the product of its own investigation into the background of Gardner. It is not unreason-

able to assume that the defendants had their own sources of information as to Gardner's background because Gardner claimed membership in the Communist Party from 1933 until about the year 1955 (which was not controverted) and almost continuous affiliation with U.E. from 1937 until about 1950. His associates must have known something about him. The defense was in possession of U.E. records on Gardner which they used for cross-examination purposes at the trial. In any event, the defendants had the opportunity to conduct their own investigation. Due diligence would have required them to do so.

■■■ Gardner was not questioned on direct examination as to his previous places of residence or of employment. The report could not very well be used to impeach him as to collateral matters developed on cross-examination.

The defense, not having been entitled as a matter of law to the reports in question, cannot complain of the Government's failure to produce them.

Much is made over discrepancies in Gardner's testimony on cross-examination over dates of his marriage and divorce, his birth, employment and his talks with F.B.I. agents. His testimony covered such a wide variety of persons, places and dates that inaccuracies would be bound to creep in without a written record which he did not keep. Many of the dates were merely his best judgment, and some of the answers were suggested to him in the form of the question put to him on cross-examination. This was true as to the questions relating to his service in the Armed Forces, marriage and divorce. Tr. 896, 883, 884.

■■■ Gardner's marriage to his present wife was a common law marriage and the relationship actually commenced shortly before the divorce from his first wife became final on July 1, 1946 and he has lived with and supported his common law wife ever since. Three children, all boys, whose ages are 12, 11 and 6 years have been born of this marriage. It is even suggested by the defense that Gardner is guilty of bigamy and adultery because he lived with his wife before the divorce became final. The common law marriage could not become effective until Gardner's divorce became final. Such a marriage, while not favored, is recognized as valid in Ohio and many other states. Umbenhower v. Labus, 85 Ohio St. 238, 239, 97 N.E. 832; 39 A.L.R. 538; 60 A.L.R. 541; 94 A.L.R. 1000; 133 A.L.R. 758. This is particularly true where the legitimacy of children is involved.

Gardner was not questioned at the trial as to whether his marriage was ceremonial or common law, but the question was raised in the hearing on this motion. Gardner testified that common law marriages were not looked upon with disfavor by the Communist Party and it must be remembered that Gardner was a Communist when this relationship was entered into.

The Mesarosh case has been relied on generally by the defense. A studious effort has been made to make Mesarosh and the case at bar appear to be analogous. They are materially different.

There, the Solicitor General confessed error in the Supreme Court and moved to remand the case because of bizarre testimony of a paid informer in subsequent proceedings which the Government knew to be false and which cast a serious doubt on his credibility or even his mental stability. Here, the Government has not confessed error, but rather stands behind its witness.

There, the informant's testimony was assailed on the principal issues. Here, the attack relates to collateral matters. Falsity on a material issue in connection with the charge in the indictment was not established.

Gardner was not a paid informer. He received reimbursement only for his expenses. There is no evidence that he informed to the F.B.I. until after he left the Communist Party.

■■■ The defendants were not, in my judgment, convicted on perjured testimony.

The motion and supplementary motion for a new trial on the ground of newly discovered evidence are overruled. The petition under Title 28 U.S.C. § 2255 and for Writ of Coram Nobis is hereby dismissed.