UNITED STATES of America,
Plaintiff,

v.

Paul J. HEIDEMAN and Daniel R. Brennan, Defendants.

Crim. No. 1123-57.

United States District Court
District of Columbia.

Feb. 3, 1958.

Oliver Gasch, U. S. Atty., and Joel D. Blackwell, Asst. U. S. Atty., for the District of Columbia, Washington, D. C., for plaintiff.

Walter E. Gillchrist, Washington, D. C., for defendant Heideman.

John J. Dwyer, Washington, D. C., for defendant Brennan.

HOLTZOFF, District Judge.

The defendants are on trial on an indictment for robbery, in that on the night of October 24, 1957, they hailed a taxicab, entered it, and when the taxicab arrived at the destination designated by the defendants, one of them hit the driver over the head with a sock containing gravel. The driver became unconscious and while he was unconscious one of the defendants took his wallet.

The Government seeks to introduce in evidence oral confessions made by the defendants to a member of the Police Department who investigated this case. The defense counsel object to their admissibility on the alleged ground that they were obtained subsequently to the time when the defendants should have been taken before a committing magistrate, and cite in support of this contention the recent decision of the Supreme Court in Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479.

The circumstances under which these confessions were obtained are as follows, as elicited without contradiction at the preliminary hearing on this question, conducted by the Court out of the presence of the jury. The two defendants are members of the United States Navy. At the time of the robbery the two robbers wore naval uniforms. As a result of an investigation skillfully conducted by a member of the Detective Bureau of the Metropolitan Police Department of Washington, D. C., it was ascertained that the two sailors who were passengers

in the taxicab were members of the crew of the U.S.S. Tallahatche, which was then anchored near the Navy Yard. By means of further intensive investigation, which it is not necessary to summarize, the detective in charge of the case ascertained that the two defendants were the members of the crew that had participated in the robbery.

The detective proceeded to the Navy Yard and explained the situation to one of the officers in charge. That officer then sent two Armed Services Police officers to the ship in order to bring the two sailors to Police Headquarters. At about three o'clock on the afternoon of October 25th, the two defendants were brought to the Robbery Squad office of the Metropolitan Police Department by representatives of the Armed Services Police, and were turned over to the custody of the Metropolitan Police Department.

The detective in charge of the case immediately telephoned to the Liaison Officer of the Armed Services Police, who had his office in the same building. The latter promptly came over to the Robbery Squad office. / Within five minutes or so after the defendants were brought to Police Headquarters, the detective questioned defendant Brennan, who promptly and freely admitted that he was in the front seat of the taxicab when the cab driver was struck, and that he, Brennan, then pulled the emergency brake and brought the vehicle to a stop. This interrogation took ten or fifteen minutes.

The detective thereupon questiond the defendant Heideman, and then confronted the two defendants with each other. Heideman persisted in denying any participation in the offense. The detective proceeded to prepare the necessary papers, and after completing them again asked the defendant Heideman whether he desired to make a statement or let the matter stand as it was. Heideman then confessed that he had committed the robbery and told in some detail that he had packed some gravel in a sock in Brennan's presence; that they later hailed a taxicab and that he, Heideman, struck the taxi driver with the sock filled with gravel; and while the taxi driver was unconscious took his wallet, which turned out to be empty.

The entire proceeding from the moment of the defendants' arrival at Police Headquarters and the completion of the questioning took thirty to forty-five minutes. The defendants were then immediately booked in the Detective Bureau and taken to the Identification Bureau for fingerprinting and other routine matters. Immediately after that, they were brought before the United States Commissioner for a preliminary hearing. The preliminary hearing took place at about 4:10 or 4:15 P.M. Thus, the undisputed testimony shows that from the moment the defendants came into the custody of the Metropolitan Police Department until they were brought before the United States Commissioner, the total time that elapsed was about seventy or seventy-five minutes.

The question to be determined must be subdivided into two for the purpose of clarity of thought. The first question is how soon after the arrest must a prisoner be brought before a committing magistrate. The second question is, if there is an undue delay in bringing the defendant before a committing magistrate, what is the consequence as concerns the admissibility of a statement made by the prisoner during the period of undue delay.

■ The first of these issues is a matter of procedure. The second is a question of the law of evidence. The first question does not involve a constitutional right, for there is no constitutional right to a preliminary hearing. It is governed by Rule 5 of the Federal Rules of Criminal Procedure, 18 U.S. C.A. Rule 5(a) provides that an officer making an arrest shall take the arrested person without unnecessary delay before the nearest available commissioner or before any other nearby officer empowered to commit persons charged with

offenses against the laws of the United States. The Rule does not state that the prisoner must be taken before a committing magistrate forthwith or immediately. It provides that it shall be done "without unnecessary delay".

It so happens that I was a member and the Secretary of the Advisory Committee appointed by the Supreme Court to prepare a draft of the Federal Rules of Criminal Procedure. The records of the Committee will show that the words "without unnecessary delay" were deliberately chosen and were not to be taken as synonymous with "immediately" or "forthwith". The notes of the Advisory Committee appended to the Rules disclose the intent of the Committee. To be sure, they are not binding on the Supreme Court, but they fulfill the same analogous role as that played by a Congressional Committee report in determining what the Congressional intent was in framing a statute. The notes of the Advisory Committee indicate that the words "without unnecessary delay" were used as equivalent to "reasonable time". The notes cite a number of authorities which discuss the question what constitutes a reasonable time for the purpose of bringing a defendant before a committing magistrate. Some of these authorities sanction a much longer interval of time than is involved in this case.

In discussing the Mallory case, it is important to bear in mind the basic principles that govern the construction of judicial decisions. An opinion of a court is not to be treated and read as an essay in determining the rule of law to be evolved therefrom. A judicial decision must be analyzed in the light of the facts involved in the case. Any statements that are extraneous to the facts, although they must receive respect, do not constitute the law.

In fact, the common law has evolved by an inductive process of reasoning from series of decisions on specific points. The process is limited to collating not the statements in the various decisions but the precise rulings. These elementary principles were pungently summarized by Chief Justice Marshall in the case of Cohens v. Commonwealth of Virginia, 6 Wheat. 264, 399, 5 L.Ed 257:

> "It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated."

It is with the guidance of these principles that we must determine what the Mallory case actually decided, rather than from a general reading of its opinion. The Mallory case involved an atrocious rape that occurred in the basement of an apartment house. The victim of the crime lived with her husband in one of the apartments in the building. She was in the basement in the laundry room doing the family wash. The janitor's apartment was also located in the basement and opened into the laundry room. A masked man came out of the janitor's apartment and viciously attacked the victim, dragged her into the adjoining boiler room and criminally assaulted her. Naturally, the police department immediately endeavored to ascertain the identity of the inhabitants of the janitor's apartment. It was found that the apartment was inhabited by the janitor and two adult nephews, one of whom was Mallory. Necessarily, suspicion attached to all three, and all of them were apprehended and taken to Police Headquarters for further investigation. There is no doubt

as to the propriety of this course because, as was recently stated by the United States Court of Appeals for the District of Columbia Circuit, in the case of Bell v. United States, 254 F.2d 82, "Suspicion on reasonable grounds" constitutes probable cause for making an arrest on a felony charge.

Mallory was apprehended between 2:00 and 2:30 o'clock in the afternoon. He and the other two suspects were questioned. After the interrogation the three suspects were asked to submit to a lie detector test and they agreed. As a result of further questioning and the lie detector tests two of the prisoners were cleared and Mallory was charged with the rape. He finally confessed that he was the guilty party. By that time it was 10:00 P.M. The police then attempted to reach the United States Commissioner in order to arraign the defendant, but were unable to get in touch with him and, therefore, did not bring the defendant before the Commissioner until the following morning. In the meantime the defendant dictated a confession to a typist, and signed it in due course. This occurred between 11:30 P.M. and 12:30 A.M. The Supreme Court held that the lapse of time between 2:30 P.M. and 10:00 P.M. before there was an attempt to take the defendant to a committing magistrate was too long an interval, and ruled further that the confession was not admissible and reversed the conviction, although the defendant's guilt was unquestioned.

While there are some statements in the opinion of the Court that are somewhat broader than the precise holding, the actual rule that can be deduced from the case in the light of the facts there involved, is that a period from 2:30 P.M. until 10:00 P.M.,—about seven and one-half hours,—is too long an interval and constitutes an unreasonable delay . in bringing a prisoner before a committing magistrate. The opinion recognized that circumstances may justify a brief delay between arrest and arraignment, for example, if the story volunteered by the accused is susceptible to quick verification through third parties. Again the Court emphasizes the fact that the command to arraign without unnecessary delay does not call for mechanical or automatic obedience.

The Mallory case must be considered in connection with the decision in United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140, in which a similar question was involved. There, the suspect in a housebreaking case was taken into custody and driven by two police officers to a police station. Within a few minutes after his arrival at the police station the defendant admitted his guilt, told the officers of various items of stolen property to be found in his home and consented to their going to his home to recover the property. The Court held that in that instance the confession was admissible, as there had been no unnecessary delay between the time of arrest and the time when the confession was obtained.

It is significant to observe that the same member of the Supreme Court wrote the opinion in the Mitchell case as wrote the opinion in the Mallory case. Yet the Mitchell case is not mentioned in the opinion of the Mallory case. Each decision involved only one point presented for the determination of the Court. It would not do, therefore, to infer that on such an important issue the writer of both opinions intended to overrule the Mitchell case by implication. It is more reasonable to assume that both cases stand.

The result of the two decisions, therefore, is that a questioning immediately after an arrest, provided the interrogation is not prolonged, does not violate the rule requiring that the prisoner be arraigned before a committing magistrate without unnecessary delay. On the other hand, the rule of the Mallory case is that a seven and one-half hour delay is too long. Where the line is to be drawn must be determined according to the usual process of the common law by judicial

decisions as cases arise. A graph must be gradually plotted by a series of rulings on specific states of facts.

■ It is clear that the case at bar falls within the principle of the Mitchell case, rather than within the doctrine of the Mallory case, because here the questioning of the defendants was conducted immediately upon their being delivered to the custody of the local police. The questioning consumed a very short time. The prisoners were brought before a committing magistrate not more than an hour and a quarter after they came into the control of the police. Clearly, under the rule of the Mitchell case, there was no unreasonable delay in this instance and, therefore, the confession was properly obtained and is admissible.

This discussion would not be complete without reference to the second aspect of the problem, namely, what is the consequence of an unnecessary delay in bringing a prisoner before a committing magistrate. The Federal Rules of Criminal Procedure are silent on this point. In fact, the Advisory Committee of the Supreme Court in formulating the rules had before it a proposal to the effect that failure to comply with the rule should render inadmissible any statement made by the defendant during the period of undue detention. The Committee rejected this proposal on the ground that such a penalty for a violation of the Rule would be too drastic and would be visited not on the delinquent officer, but on the public. We are dealing, therefore, here not with one of the rules of Criminal Procedure, but with a rule of evidence derived from case law.

■ Rule 26 of the Federal Rules of Criminal Procedure expressly provides that the admissibility of evidence shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. Necessarily, the common law applied by the Federal courts is determined by the Supreme Court of the United States on all points on which that tribunal speaks. The Supreme Court has determined in the Mallory case, as well as in the case of Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100, that a confession made during a period subsequent to that when the defendant should have been brought before a committing magistrate is not admissible in evidence.

These cases made a drastic change in the law of evidence. Prior to these decisions the test of admissibility of a confession was whether it was voluntary, and any confession that was voluntary was admissible. Necessarily, undue delay in bringing the defendant before a committing magistrate might be some evidence that the confession was involuntary, but standing alone it was not sufficient to vitiate it. The rule of evidence enunciated by the Supreme Court is naturally subject to change by an Act of Congress.

In the instant case, however, this penalty need not be visited on the public, because as has been stated this court is of the opinion that there was no unnecessary delay in bringing these defendants before a committing magistrate. Consequently, the confessions were not obtained during any period of unlawful delay.

The court might add that it is always necessary to have a fundamental philosophy as a basis for legal principles. The criminal law is intended to protect the public, while assuring certain privileges to persons accused of crime in order that innocent persons may not be convicted and in order that even the guilty shall not be treated with oppressive methods. The philosophy of the criminal law was picturesquely formulated by Mr. Justice Cardozo in Snyder v. Commonwealth of Massachusetts, 291 U.S. 97, 122, 54 S.Ct. 330, 338, 78 L.Ed. 674. In his usual inimitable manner, the learned Justice says: "Justice, though due to the accused, is due to the accuser also. The concept of fairness must not be

strained till it is narrowed to a filament. We are to keep the balance true."

Another great jurist of our time, Judge Learned Hand, vividly discussed some of these principles in United States v. Garsson, D.C., 291 F. 646, 649. He said: "Under our criminal procedure the accused has every advantage. While the prosecution is held rigidly to the charge, he need not disclose the barest outline of his defense. He is immune from question or comment on his silence; he cannot be convicted when there is the least fair doubt in the minds of any one of the twelve. * * * Our dangers do not lie in too little tenderness to the accused. Our procedure has been always haunted by the ghost of the innocent man convicted. It is an unreal dream. What we need to fear is the archaic formalism and the watery sentiment that obstructs, delays, and defeats the prosecution of crime."

The objective of the criminal law is to safeguard the public and its individual members against depredations on the part of those persons who have no regard for the rights of others. Every member of the community has a constitutional right to be protected in the safety of his person and his property. The victim of the crime must not become a forgotten man. His rights are much greater than those of the criminal. When the criminal law ceases to protect the public, it has failed of its purpose.

Unfortunately, too often trials seem to degenerate into a sophistical, casuistical debate over matters that have no bearing on the real question at issue, which is whether the defendant committed the crime with which he is charged. All too frequently the trial of a criminal case becomes a theoretical disputation over the question whether certain moves were correctly made, or certain ceremonials were accurately followed. One sometimes gets a feeling that such a trial is being conducted in a remote artificial world that may be depicted by a Dean Swift or a Lewis Carroll. It is a mockery of justice to permit trials to be deflected to a point where the question of the guilt or innocence of the defendant is almost entirely forgotten.

The objection to the admissibility of the evidence is overruled.