**UNITED STATES of America**

v.

**August Edward SCHARTNER, Jr.**

**Cr. No. 22602.**

United States District Court
E. D. Pennsylvania.
July 26, 1967.

Francis R. Crumlish, Asst. U. S. Atty., for the United States.

John Patrick Walsh, Philadelphia, Pa., for defendant.

MEMORANDUM SUR MOTION FOR NEW TRIAL (Document 11) AND SUR MOTION FOR NEW TRIAL ON THE GROUND OF AFTER-DISCOVERED EVIDENCE (Document 21)

VAN DUSEN, District Judge.

This case is before the court on the above Motion For New Trial (Document 11) and For New Trial on the Ground of After-Discovered Evidence (Document 21) filed after a trial, at the end of which the jury returned a verdict of guilty on all four counts of an Indictment charging the defendant with robbing the Bridesburg office of the Girard Trust Bank in North Philadelphia with a gun and carrying away more than $84,500. (see 18 U.S.C. § 2113). The principal defense argued to the jury by counsel for defendant (N.T. 468–491) was that the Government had failed to meet its burden of proving that the defendant was the person who had robbed the Bridesburg Bank on July 6, 1966.[1] The Government relied on three eye witnesses to establish identification of the defendant and also offered considerable circumstantial evidence in support of its claim, including the fact that over $40,-000. in cash was found in the possession of the defendant when he was arrested in Oklahoma several weeks after the date of the robbery. The testimony of each of the three eye witnesses contains elements which enabled counsel for defendant to attack their accuracy.

The bank manager was attacked as an interested witness and because, when first questioned, he failed to remember that the robber was wearing glasses at the time of the robbery. See N.T. 42–44, 97 and 105–6.[2]

---

1. The defendant did not take the stand and did not offer any evidence in his defense.

2. This witness conceded that he was confused and very emotionally jittery after

Mrs. Rose J. Harvey (the head teller) conceded that the night of the robbery she was shown six boxes of pictures at the Philadelphia police headquarters (N.T. 128) and that she selected one picture of an individual, other than the defendant, as containing a front view reflecting a facial outline and chin similar to that of the man who committed the holdup (N.T. 129). Mrs. Harvey also testified that there was no doubt in her mind that the defendant was the man who robbed the bank (N.T. 150).

The only eye witness who was not an employee of the bank which had been robbed was a truck driver for the United Parcel Service, who delivered parcels for Philadelphia department stores in the area of the branch bank. He testified that he was parked directly across the street from the entrance to the branch bank at 2:20–2:30 P.M. on July 6, 1966 (N.T. 151–6). He observed (N. T. 154–5):

" * * * a man coming out of the bank dressed in a dark blue suit, and glasses, or a dark black suit. It was in a dark nature like that. He looked up and down the street. And he looked straight across the street at me. Or at my truck, I don't know which. But then he proceeded down Thompson Street towards Bridge Street. And got into a car.

"Q And would you be able to recognize that man if you saw him again?

"A Yes, sir.

"Q Is he in the Courtroom?

"A Yes, sir.

"Q Would you come down from the stand and point him out for us?

"A Yes, sir.

"THE COURT: You may go down.

(The witness leaves the witness stand.)

"THE WITNESS: This man right here, sir, (indicates).

"THE COURT: The record will note that the witness has identified the defendant, standing at the counsel table across from him."

At N.T. 175 this witness testified that, since the man he saw leaving the bank was well dressed, he continued to look at him. The man came out of the bank, looked both ways, turned and walked casually down Thompson Street with an attache case. This man was about 25 feet from the truck driver when he started to walk away from the entrance to the bank (N.T. 176–7). This witness testified that he had just made deliveries of merchandise to places of business near the branch bank. This witness was unknown to defendant and his counsel until he was called to the stand on the first day of the trial. The witness was excused at about 4:20 in the afternoon of the first trial day and directed to return at 2:30 the next afternoon in order to give counsel for defendant an opportunity to look up certain records concerning the rejection of two applications he had filed for employment by the Philadelphia police force. The trial court also gave counsel for defendant an opportunity to recall this witness for further cross-examination on the morning of the third day of the trial, but no records of the Philadelphia Police Department concerning the witness could be found so that this opportunity was declined (N.T. 375–6).

Since the trial, it is now conceded by the Government that this witness did not make any deliveries of merchandise to either of the two places in the immediate vicinity of the branch bank on the afternoon of July 6[3] and that he was present at 5000 Richmond Street, being a plant of the Rohm & Haas Company, from 2:22 to

the event (N.T. 93), but he also testified that he had no doubt in his mind that the defendant was the man who robbed the bank on July 6, 1966.

3. Paragraph 1–9 of the Motion For New Trial on the Ground of After-Discovered

Evidence (Document 21) have been admitted by the letter of July 5, 1967, attached to the Government's MEMORANDUM OF LAW Contra that Motion (Document 22).

2:49 on the afternoon of July 6.[4] The bank robbery alarm which was sounded immediately after the robber left the branch bank was activated at 2:25 P.M. The Government concedes that it would take at least five minutes normal driving time to drive from 5000 Richmond Street (Rohm & Haas plant) to the location of the above-mentioned branch bank.

Counsel for the defendant spent five pages (N.T. 485–491) of his closing argument covering 12½ pages in attacking the credibility of this disinterested eye witness.

The jury retired to consider its verdict at 12:31 P.M. on April 7 and, having been taken out to lunch in the meantime, at approximately 5:25 P.M. the jury sent the trial judge a message as follows:

"Sorry, we are hopelessly deadlocked, cannot come to a unanimous decision." (N.T. 536)

The jury was brought back to the courtroom and the trial judge supplemented his charge, asking them to continue their deliberations and try to come to a unanimous verdict if they could do so without giving up a conscientiously held belief (N.T. 538–42). After the supplemental charge, Juror No. 11 asked to have a question and answer which was asked of Mrs. Harvey during the trial read back to the jury. This question concerned whether or not Mrs. Harvey could identify the picture of a person other than the defendant which she had tentatively identified as looking like the defendant the night of the robbery at police headquarters (N.T. 542–3). Since the court reporter who had taken that part of the testimony was not available, it was impossible to read such question and answer to the jury, and the jury was sent out of the courtroom to resume their deliberations at 6 P.M. (N.T. 552–6). The jury returned to the courtroom with its guilty verdict at 8:49 P.M., having been taken to dinner by the Marshal in the meantime (N.T. 559).

There is no evidence whatever that the Government had any knowledge at the time of the trial that the testimony of the truck driver was inaccurate, but the Government, with commendable candor, has conceded that this witness could not have observed the robber emerging from the branch bank about 2:30 P.M. on July 6, 1966, as he testified before the jury.

The trial judge cannot agree that the after-discovered evidence is "such that a new trial would probably produce a new result," as contended at page 3 of defendant's Memorandum (Document 23). The evidence of guilt was strong and there is no requirement that the truck driver be produced as a witness by the Government. See McCray v. State of Illinois, 386 U.S. 300, 313–314, 87 S.Ct. 1056, 1064, 18 L.Ed.2d 62 (1967), where the court used this language:

" * * * we need no more than repeat the Court's answer to that claim a few weeks ago in Cooper v. California, [386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730]:

" 'Petitioner also presents the contention here that he was unconstitutionally deprived of the right to confront a witness against him, because the State did not produce the informant to testify against him. This contention we consider absolutely devoid of merit.' "

The trial judge was surprised that the jury took so long to come to a conclusion, even though the able and experienced lawyer [5] for the defendant did a magnificent job of argument without producing any evidence. However, it is possible that a new trial would produce a different result.[6] As noted above, at least one juror had difficulty in reaching

---

4. See attached letter of July 20 with enclosures for stipulation, which also covers the evidence in the next two sentences.

5. This case is one of many illustrating that the defendant who can afford an able and experienced lawyer gets a more favorable result in the criminal courts than the defendant who has to rely on the overworked, court-appointed attorneys.

6. It is possible that the jury rejected the identification testimony of both the bank manager and the chief teller (Mrs. Harvey).

a unanimous verdict. Although it is doubtful whether defendant is entitled to the grant of his second Motion (Document 21) on this record,[7] defendant is entitled to the grant of his Motion For New Trial filed within seven days of the jury's verdict (Document 11), since F.R. Crim.P. 33 provides that a new trial may be granted "if required in the interest of justice." Although the cases are not identical, the trial judge believes this language in Mesarosh v. United States, 352 U.S. 1, 9–12, 77 S.Ct. 1, 5–7, 1 L.Ed.2d 1 (1956), applies to this situation:

> "The dignity of the United States Government will not permit the conviction of any person on tainted testimony. This conviction is tainted, and there can be no other just result than to accord petitioners a new trial.
>
> \* \* \* \* \* \*
>
> " \* \* \* it cannot be determined conclusively by any court that his testimony was insignificant in the general case against the defendants. \* \* \*
>
> \* \* \* \* \* \*
>
> " \* \* \* The district judge is not the proper agency to determine that there was sufficient evidence at the trial, other than that given by Mazzei, to sustain a conviction of any of the petitioners. Only the jury can determine what it would do on a different body of evidence, and the jury can no longer act in this case. \* \* \* "

For the foregoing reasons, the Motion For New Trial (Document 11) will be granted and it is unnecessary to consider all the reasons stated in that Motion and in the document entitled "Additional Reasons In Support of Motion For New Trial" (Document 19).[8] The Motion For New Trial on Grounds of After-Discovered Evidence (Document 21) will be dismissed as moot.

### ORDER

And now, July 26, 1967, it is ordered that the motion for new trial (Document 11) is granted, and the motion for new trial on grounds of after discovered evidence (Document 21) is dismissed as moot.

---

7. See United States v. Rutkin, 208 F.2d 647 (3rd Cir. 1954); cf. Mesarosh v. United States, 352 U.S. 1, 9–10, 77 S.Ct. 1, 1 L. Ed.2d 1 (1956). United States v. Aviles, 197 F.Supp. 536 (S.D.N.Y.1961), cited by the Government, is factually different from the situation presented by this case.

8. The briefs and memorandum bearing on defendant's Motion For New Trial (Document 11) have been docketed as Documents 24 to 27. In view of the authorities cited in Defendant's Reply Brief (Document 26), it may be helpful to say that nothing which transpired during the trial in April 1967 made it appear that there had been an unconstitutional seizure of documents justifying any modification of Judge Luongo's order of 1/18/67, denying the MOTION TO SUPPRESS EVIDENCE (Document 3).