**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Alvin McBRIDE, Defendant-Appellant.**

No. 71-2332.

United States Court of Appeals,
Fifth Circuit.

June 27, 1972.

Rehearing and Rehearing En Banc
Denied Aug. 11, 1972.

See also, 5 Cir., 438 F.2d 517.

Louis P. Trent, George M. Leppert, New Orleans, La., for defendant-appellant.

Gerald P. Gallinghouse, U. S. Atty., Joseph R. McMahon, Jr., Mary Williams Cazalas, Asst. U. S. Attys., New Orleans, La., for plaintiff-appellee.

Before RIVES, COLEMAN and DYER, Circuit Judges.

COLEMAN, Circuit Judge:

This is an odd case.

Almost three years ago, the grand jury for the Eastern District of Louisiana indicted Alvin McBride for the theft of thirteen bags of coffee, while it was moving in foreign commerce from Mexico to the United States, 18 U.S.C. § 659. A conviction followed. This Court affirmed, United States v. McBride, 438 F.2d 517 (February 10, 1971). We held, "There is no merit to any of the appellant's contentions".

Our opinion [Judges Brown, Wisdom, and Roney] further stated:

We note especially that there was probable cause to arrest the defendant and seize the coffee when the harbor police officer, Captain Allemand, observed the coffee in the rear of the parked truck which had been driven by the defendant.

The Supreme Court denied certiorari, McBride v. United States, 403 U.S. 920, 91 S.Ct. 2236, 29 L.Ed.2d 698 (1971). About a month subsequent to the denial of certiorari, alleging the discovery of new evidence, McBride filed a motion for a new trial. This motion was denied. McBride again appeals. We affirm.

At the original trial there was a motion to suppress the coffee which had been seized at the time of McBride's arrest. It was argued that there was no probable cause for the arrest; hence the search of McBride's truck, from which the coffee had been seized, was unlawful. The key witness at the suppression hearing was Captain Allemand, of the New Orleans Harbor Police.

There had been a rash of thefts from the docks. Prior to the date of the offense in question a paid informer had been calling the harbor police to report various thefts. On the day of McBride's arrest, this informer notified the harbor police that he had observed a vehicle used in one of the previous thefts. Captain Allemand and some of his men set out to investigate. On Market Street, they spotted a van and commenced to follow it. It later turned out that this was *not* the van observed by the informer.

At the suppression hearing, Allemand testified that he identified McBride as the driver of the van and this aroused his suspicion because McBride had been involved in an investigation of dock thefts some four years before (from which no arrest or conviction resulted). After McBride's van had been followed for sometime, it turned into a driveway at a residence. Allemand got out of his vehicle and approached the van. He looked into the van through the rear windows, upon which he saw burlap bags on the floor, which he identified as coffee bags. McBride was arrested, the truck was searched, the bags were seized, and they had been stolen from the wharves.

With that testimony in the record, this Court held that there was probable cause to arrest the defendant and to seize the coffee.

To this point, there is no difficulty, but difficulties soon developed in a most unprecedented manner.

After McBride had been convicted, Captain Allemand suffered a stroke. McBride was out on bail, pending ap-

peal. He went to see Allemand at the hospital, visited him every night in his home, and taught him to walk again.

On November 23, 1970, Captain Allemand's condition took a quick turn for the worse and he was rushed to the hospital. He died the next morning. Before he died, Allemand sent for McBride to come to the hospital. They conversed privately. Allemand told his wife that he had not told the truth at the suppression hearing; that, in fact, he had *not* recognized McBride when the van was first sighted but had followed the van essentially out of general suspicion. Moreover, he had not looked into the van nor had he seen any coffee bags before making the arrest. Specifically, Allemand thus repudiated the testimony which had established probable cause and had paved the way for the admissibility of the stolen coffee. He asked Mrs. Allemand to so inform the Court.

In the light of these developments, McBride moved for a new trial. The District Court heard Mrs. Allemand's testimony, stated that he had no doubt that she was telling the truth as to what her husband had said, but denied the motion.

Under the recited circumstances the sole issue is: Did the District Court err in the denial of a new trial?

Rule 26 of the Federal Rules of Criminal Procedure provides that:

The admissibility of evidence and the competency and privileges of witnesses shall be governed, except when an act of Congress or these rules otherwise provide, by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

■ The common law applied by the Federal Courts is determined by the Supreme Court of the United States on all points on which that Court has spoken, United States v. Heideman, 21 F.R.D. 335, 339 (D.D.C., 1958), affirmed, 1958,

104 U.S.App.D.C. 128, 259 F.2d 943, cert. denied 359 U.S. 959, 79 S.Ct. 800, 3 L.Ed. 2d 767.

■ This situation points directly to the decision of the Supreme Court in Mattox v. United States, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895).

In that case Mattox, on his third trial, had been sentenced to death for a murder allegedly committed in a part of the Indiana Territory within the exclusive jurisdiction of the United States. Mattox had been once convicted and that conviction was reversed. A second trial resulted in a hung jury. At the trial under review the government introduced, by transcript, the testimony of a witness who had died since the preceding trial. Mattox then proposed to impeach this testimony by showing that subsequent to the former trial the dead man had said that he did not see Mattox do the shooting, that he could not tell who did the shooting, that all he had testified to on the former trial was false, and that he wanted to leave the country; moreover, he had told a second individual that he had been forced to testify falsely.

Quoting the opinion of the Supreme Court, 156 U.S. at 245, 15 S.Ct. at 340:

Objection was made by the district attorney to the introduction of this testimony upon the ground that Whitman [the deceased witness] had been examined and cross-examined upon the former trial; that the questions could not be propounded to the witnesses James and Violet for the purpose of impeachment, as the government had lost the opportunity, by the death of the witness Whitman, of putting him upon the stand and contradicting them. The facts were that the statements of Whitman, which the defendant proposed to prove by the witnesses James and Violet, were made after the former trial, so that the proper foundation could not have been laid by asking Whitman whether he had made such statements.

The Supreme Court, although divided six to three, held:

The authorities, except in some of the New England States, are almost unanimous to the effect that, before a witness can be impeached by proof that he has made statements contradicting or differing from the testimony given by him upon the stand, a foundation must be laid by interrogating the witness himself as to whether he has ever made such statements. Justice to the witness himself requires not only that he should be asked whether he had ever made such statements, but his attention should be called to the particular statement proposed to be proven, and he should be asked whether, at such a time and place, he had made that statement to the witness whose testimony is about to be introduced. This method of impeachment was approved by this court in Conrad v. Griffey, 16 How. 38, 46 [14 L.Ed. 835], wherein the rule is stated to be 'founded upon common sense, and is essential to protect the character of a witness. His memory is refreshed by the necessary inquiries, which enable him to explain the statements referred to, and show that they were made under a mistake, or that there was no discrepancy between them and his testimony.' In this case the deposition of a witness taken in the cause was sought to be impeached by a letter of the witness written before his deposition, and addressed to the plaintiff, with an affidavit annexed by him of the same date. The general rule is also approved in The Charles Morgan, 115 U.S. 69, 77, 5 S.Ct. 1172 [29 L.Ed. 316], although in that particular case it was held that proper foundation had been laid for the introduction of the evidence. The principle was also approved in Chicago, Milwaukee & St. Paul Railway v. Artery, 137 U.S. 507 [11 S.Ct. 129, 34 L.Ed. 747].

It is insisted, however, that the rule ceases to apply where the witness has died since his testimony was given, and the contradictory statements were either made subsequent to the giving of his testimony, or, if made before, were not known to counsel at the time he was examined; that if such contradictory statements be not admitted, the party affected by his testimony is practically at the mercy of the witness; that the rule requiring a foundation to be laid is, after all, only a matter of form, and ought not to be enforced where it works a manifest hardship upon the party seeking to impeach the witness. *The authorities, however, do not recognize this distinction* [emphasis added].

\* \* \* \* \* \*

While the enforcement of the rule, in case of the death of the witness subsequent to his examination, may work an occasional hardship by depriving the party of the opportunity of proving the contradictory statements, a relaxation of the rule in such cases would offer a temptation to perjury, and the fabrication of testimony, which, in criminal cases especially, would be almost irresistible. If it were generally understood that the death of a witness opened the door to the opposite party to prove that he had made statements conflicting with his testimony, the history of criminal trials leads one to believe that witnesses would be forthcoming with painful frequency to make the desired proof. The fact that one party has lost the power of contradicting his adversary's witness is really no greater hardship to him than the fact that his adversary has lost the opportunity of recalling his witness and explaining his testimony would be to him. There is quite as much danger of doing injustice to one party by admitting such testimony as to the other by excluding it. The respective advantages and disadvantages of a relaxation of the rule are so problematical that courts have, with great uniformity, refused to recognize the exception.

*Three of the Justices filed a strong dissent:*

If the evidence tending to show that the testimony of an essential witness cannot be relied on, because he has made contradictory statements elsewhere, and at other times, is valid and admissible, as the authorities all concede, why

should the right to put in such evidence be destroyed by the incidental fact that the witness, by reason of death, cannot be produced to deny or to admit that he made such statements? Does not the necessity call for a relaxation of the rule in such a case?

\* \* \* \* \* \*

To conclude: The rule that a witness must be cross-examined as to his contradictory statements before they are given in evidence to impeach his credit is a rule of convenient and orderly practice, and not a rule of the competency of the evidence.

To press this rule so far as to exclude all proof of contradictory statements made by the witness since the former trial, in a case where the witness is dead, and the party offering the proof cannot, and never could cross-examine him as to these statements, is to sacrifice substance of proof to orderliness of procedure, and the rights of the living party to consideration for the deceased witness. 156 U.S. 257, 260, 15 S.Ct. 345.

A thorough search of the reported criminal cases discloses no subsequent decision of the Supreme Court, or of any other Federal Court, on this question.[1]

It is obvious, therefore, that in its *Mattox* decision the Supreme Court has, to this point in time, determined the rule of evidence controlling the admissibility or inadmissibility of Captain Allemand's unsworn, dying retraction of his prior sworn testimony, Rule 26, Federal Rules of Criminal Procedure. The record reveals that in the court below neither the United States Attorney nor counsel for the defendant were aware of the *Mattox* case. It therefore was not called to the attention of the trial Judge. Nevertheless, when he denied the new trial he reached the right result. Since the dying statements of Captain Allemand may not now be used to impeach his former testimony, a new trial would be useless. There could be nothing *new* to consider.

■ Diligent counsel for McBride, who have vigorously represented him every step of the way, contend that Mattox v. United States, *supra*, should be distinguished on the ground that the impeaching testimony there declared inadmissible was offered at a trial on the merits rather than on motion for a new trial. This, as we see it, is of no help. On a new trial, the threshold (and determinative) issue will again be the suppression of the coffee as evidence in the case. If Allemand's former testimony cannot be impeached by his ex parte, unsworn statements, offered without the required foundation for impeachment, then the record will stand unchanged, both on the motion to suppress and as to the detection of McBride in the possession of recently stolen goods.

It is also argued that the rule announced in *Mattox* "fails to come to grips with the real problem, as described by Wigmore and other authorities and is in conflict with the evolving new rule as well as the Code of Evidence sponsored by the American Law Institute". The

---

1. The Fifth Circuit has held that in a criminal case a living witness may not be impeached "until his attention has been called specifically to the former statements, with particularity as to time, place, and circumstance so he can deny or explain them", Burton v. United States, 5 Cir., 1949, 175 F.2d 960, 965.

In a civil action, the Third Circuit, without citing *Mattox*, has held that a deceased witness may not be impeached without the proper foundation. Franzen v. E. I. Du Pont De Nemours & Co., 146 F.2d 837 (1944). The Court cited Ayers v. Watson, 132 U.S. 394, 404, 405, 10 S.Ct. 116, 118, 33 L.Ed. 378 (1889) "\* \* \* it is believed that in no case has any court deliberately held that after the witness' testimony has been taken, committed to writing and used in court, and by his death he is placed beyond the reach of any power of explanation, then in another trial such contradictory declarations, whether by deposition or otherwise, can be used to impeach his testimony".

In a civil case involving the testimony of a deceased witness as to an allegedly hired assassination, the Supreme Court of Mississippi has explicitly followed *Mattox*, Kelly v. King, 196 So.2d 525 (1967).

Supreme Court has decided the question and we are bound thereby.

It is further asserted that the real issue is "whether or not there has been fraud, perjury, at the first trial which demands a new trial," but there is no claim that the prosecution knowingly used false or fraudulent testimony against McBride.

█ Finally, it is said that Rule 33 of the Federal Rules of Criminal Procedure provide for a new trial "if required in the interest of justice". Even if the testimony were admissible, and considering that the granting of a new trial is for the sound discretion of the trial Judge, it contradicts human experience that the victim of perjured testimony [McBride] would react to that terrible wrong by visiting the author of it [Allemand] on a daily basis, in the hospital and at home, assuming the prodigious task of teaching him to walk again.

While the District Court made no findings on this point, it would be reasonable to believe that McBride felt no ill will toward Allemand because he knew that the officer had not lied under oath. Additionally, it would be equally as reasonable to believe that the seriously ill, Allemand was overborne by this highly uncommon kindness, even to the extent that he felt unrestrained remorse, however unjustified, for having been an instrumentality in sending his lately acquired benefactor to prison.

If otherwise admissible, the dying statements would present a more substantial discretionary issue if McBride had not so constantly maintained personal contact with a very sick man. See, e. g., Martin v. United States, 5 Cir., 1927, 17 F.2d 973 [Judges Walker, Bryan and Foster], in which the Court held that a youthful retractor had been taken advantage of by reason of his youth and absence from home.

The motion to suppress brought on a hard fought contest in which Allemand was severely cross examined and his credibility attacked. In this connection see United States v. Dara, 5 Cir., 1970, 429 F.2d 513.

The judgment of the District Court, denying a new trial, is

Affirmed.

RIVES, Circuit Judge (dissenting):

The judgment denying McBride's motion for new trial should, I think, be reversed and the motion should be remanded for further consideration in accordance with principles of law to be stated by this Court. The essential evidence of the crime was the coffee itself, which was seized from McBride's truck without either an arrest or a search warrant. McBride moved to suppress that evidence on the ground that the coffee had been unlawfully seized. Allemand was the "key witness," indeed the only witness, who testified on behalf of the government at the suppression hearing and he was the principal government witness at the trial. If Allemand's testimony was knowingly false, then McBride's conviction should not be allowed to stand, for "the dignity of the United States Government will not permit the conviction of any person on tainted testimony." Mesarosh v. United States, 1956, 352 U.S. 1, 9, 77 S.Ct. 1, 5, 1 L. Ed.2d 1.

In *Mesarosh*, the Solicitor General moved that the case be remanded to the district court for a determination as to the credibility of one of the government witnesses. Instead the Court remanded with instructions to grant defendants a new trial.

In the present case the pertinent facts are thus stated in the majority opinion (p. 46):

"On November 23, 1970, Captain Allemand's condition took a quick turn for the worse and he was rushed to the hospital. He died the next morning. Before he died, Allemand sent for McBride to come to the hospital. They conversed privately. Allemand told his wife that he had not told the truth at the suppression hearing; that, in fact, he had *not* recognized McBride when the van was first sighted but had followed the van essentially out of general suspicion.

Moreover, he had not looked into the van nor had he seen any coffee bags before making the arrest. Specifically, Allemand thus repudiated the testimony which had established probable cause and had paved the way for the admissibility of the stolen coffee. He asked Mrs. Allemand to so inform the Court."

It is true, as stated by the majority (p. 49), " * * * there is no claim that the prosecution knowingly used false or fraudulent testimony against McBride." Such a claim, I submit, is not necessary. A motion for new trial under Rule 33, F.R.Crim.P., constitutes a direct attack on the judgment of conviction, and if the defendant proves that he was convicted on perjured testimony, he is not required to go further and prove that the prosecution used such testimony knowingly and willfully. United States v. West, D.C.Ohio, 1959, 170 F.Supp. 200, 207, aff'd 6 Cir. 1960, 274 F.2d 885; United States v. Schartner, E.D. Pa.1967, 285 F.Supp. 193.

"If the motion does not allege knowledge by the prosecution, and rests only on the ground that testimony at the trial was false, what is known as the 'Larrison rule' [Larrison v. United States, 7 Cir. 1928, 24 F. 2d 82, 87–88] applies. This is that three requirements must be met before such a motion will be granted:

"(a) The court is reasonably well satisfied that the testimony given by a material witness is false. (b) That without it the jury might have reached a different conclusion. (c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it for it did not know of its falsity until after the trial."

2 Wright, Federal Practice & Procedure § 557, p. 525. The last two requirements, (b) and (c), are clearly met. The district court failed to express its finding as to the first requirement, (a), though it did find that Allemand's wife testified truthfully as to what Allemand told her shortly before his death.

The lack of an oath to Allemand's recantation is supplied by the fact either (1) that his statement was made under belief that his death was imminent,[1] or (2) that the statement was against his interest, tending to subject him to criminal liability for perjury.[2]

The trial court exercises a broad discretion in deciding whether to grant or to deny a new trial upon newly discovered evidence,[3] but there are limits to

1. On McBride's motion for new trial, Mrs. Allemand testified that at the time of his recantation:
"THE COURT: Well, but I am thinking about a man against whom your husband had testified in Court. That type of people, did they usually come to see him while he was ill?
"THE WITNESS: Your Honor, let me put it this way: This night, on the 23rd of November, is when my husband got real, real sick. We had him in the Intensive Care Unit over at Methodist Hospital and he only requested that I call one person into the hospital and this was Alvin McBride. He wanted to talk to him. I wasn't in the room when they talked, but I came into the room later, after they had talked, and he asked me, with tears in his eyes, would I please testify. He said I would probably have to go to Court for him that he wouldn't make it.

"THE COURT: He knew he was in a dying condition?
"THE WITNESS: Yes, and the only other person I allowed to see him was Reverend Charles Green. He had requested this, that I call in Reverend Green before Captain Allemand went into surgery at 2:00 in the morning."
Transcript filed in the district court Nov. 9, 1971, pp. 18 & 19.

2. See the dissenting opinion of Justice Holmes in Donnelly v. United States, 1913, 228 U.S. 243, 277, 33 S.Ct. 449, 57 L.Ed. 820, and the opinion of Chief Justice Burger in United States v. Harris, 1971, 403 U.S. 573, 584, 91 S.Ct. 2075, 29 L.Ed.2d 723.

3. "The granting or refusing of a new trial upon newly discovered evidence of an impeaching character, including the recantation of a witness, rests in the sound discretion of the trial court; and a new

that discretion. A limit pertinent to the present case has been stated in an earlier decision of this Circuit (Judge Bryan, concurred in by Judges Walker and Foster):

"In our opinion it is the duty of a trial court to grant a new trial, where a witness at the original trial subsequently admits on oath that he committed perjury, or even that he was mistaken in his testimony provided such testimony related to a material issue, and was not merely cumulative."

Martin v. United States, 5 Cir. 1927, 17 F.2d 973, 976. I would, for the sake of accuracy and caution, add that the rule as thus stated omits an important proviso consistent with the facts of the *Martin* case, viz.: provided that the trial judge finds the recantation either to speak the truth or to be such as would probably create such doubt in the mind of a reasonable juror that he would not rely upon the testimony given by the witness at the original trial.

It does not appear from the record that the district judge exercised his discretion in accordance with the stated principles of law. To the contrary the record strongly indicates that the primary consideration of the district judge was his conception of the abstract "justice" of McBride's conviction, perhaps relying upon the opening sentence of Rule 33: "The court may grant a new trial to a defendant if required in the interest of *justice*." (Emphasis added.) Thus the district judge declared:

"It is all on technicality. There is nothing on the rightness or wrongness of the theft of the coffee. The man stole the coffee or he had it in his possession, at least. Let me put it this way: He had in his possession stolen coffee and nobody else under the evidence adduced before this Jury could possibly have loaded that coffee in his truck without his knowledge. The coffee was in his truck. It was stolen and he had possession of it, and he drove it off of the dock and you are making great to-do about the motion to suppress."

Transcript filed in the district court on Nov. 9, 1971, pp. 66 & 67.

Allemand's recantation admitting perjury goes both to his credibility as a witness on McBride's trial and to the admissibility of evidence not merely material but essential to prove McBride's guilt. It has been recognized that a new trial should be granted when the new evidence does not go to the innocence or guilt of the accused but nevertheless would probably bring about a different result. In United States ex rel. Goins v. Sigler, E.D.La.1963, 224 F.Supp. 687, aff'd sub nom., United States ex rel. Goins v. Walker, 5 Cir. 1964, 340 F.2d 6, the relator filed a habeas petition seeking to have the federal court order the State of Louisiana to grant him a new trial on newly discovered evidence. At the original trial, a confession of the relator had been admitted into evidence. On the issue of voluntariness, the relator's codefendant had testified that neither he nor the relator had been abused or mistreated. The relator came to federal district court armed with his codefendant's recantation about the circumstances surrounding the giving of the confession. The district court chose not to believe the recantation but to believe the codefendant's prior version of the circumstances. Nonetheless, the district court noted:

"Thus, the sole question now presented is one of credibility. If this Court were to decide that the [codefendant] is now telling the truth, and that he did in fact perjure himself during the

trial will not be granted on the grounds of newly discovered evidence, unless such evidence is of a nature that, on a new trial, it would probably bring about a different result. It is for the trial judge to determine the probable effect it would have in changing the result on another

trial; and in the absence of a clear showing of abuse of discretion, his action must stand." Winer v. United States, 6 Cir. 1956, 228 F.2d 944, 952, cert. denied, 351 U.S. 906, 76 S.Ct. 695, 100 L.Ed. 1442.

trial, then, of course, the question of the validity of petitioner's confession would once again be at issue."

224 F.Supp. at 689.

The question whether a confession is voluntary, like the question presented in this case, does not go primarily to the guilt or innocence of the defendant. As the Supreme Court recently opined:

"We noted in *Jackson* [*v. Denno*] that there may be a relationship between the involuntariness of a confession and its unreliability.[12] But our

"12. We noted that coerced confessions are forbidden in part because of their 'probable unreliability.' Jackson v. Denno, 378 U.S. [368], at 385–386 [84 S.Ct., at 1785, 12 L.Ed.2d 908]. However, it had been settled when this Court decided *Jackson* that the exclusion of unreliable confessions is not the purpose which a voluntariness hearing is designed to serve. Rogers v. Richmond, 365 U.S. 534 [81 S.Ct. 735, 5 L.Ed.2d 760] (1961). The sole issue in such a hearing is whether a confession was coerced. Whether it be true or false is irrelevant; indeed, such an inquiry is forbidden. The judge may not take into consideration evidence which would indicate that the confession, though compelled, is reliable, even highly so. *Id.*, at 545 [81 S.Ct. at 741]. As difficult as such tasks may be to accomplish, the judge is also duty-bound to ignore implications of reliability in facts relevant to coercion and to shut from his mind any internal evidence of authenticity which a confession itself may bear.

decision was not based in the slightest on the fear that juries might misjudge the accuracy of confessions and arrive at erroneous determinations of

guilt or innocence. That case was not aimed at reducing the possibility of convicting innocent men."

Lego v. Twomey, 1972, 404 U.S. 477, 484, 485, 92 S.Ct. 619, 624, 30 L.Ed.2d 618. Thus, the Supreme Court was saying that, even though a trial judge is convinced of the defendant's guilt, he cannot admit in evidence a confession involuntarily given.

The critical consideration is whether the new evidence would probably bring about a different result. In this case the new evidence, if credited, would certainly bring about a different result. Allemand's recantation, if believed, proves that the coffee was seized without probable cause and that McBride was unlawfully arrested. There was no testimony either at the suppression hearing or at McBride's trial which would refute Allemand's latest version of the arrest. The district judge should have resolved the question of which of Allemand's versions is true. On remand, if he gives credence to the later account, a new trial must be granted. If he chooses on adequate grounds to believe Allemand's original version, then the conviction must stand.

Mattox v. United States, 1895, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409, should not control the decision of this appeal. Though the point is far from momentous, I would suggest that the Supreme Court was divided *five* to three, instead of *six* to three as stated by the majority.[4] The views of the dissenters are in accord with the views of the most eminent legal scholars.[5] I would concede

4. Compare footnote 1 on the flyleaf of 156 U.S. listing the Justices: "Mr. Justice Jackson, by reason of illness, heard argument in no case after October 23, 1894," with the paragraph just preceding the names of counsel on 156 U.S. at p. 238 [15 S.Ct. 337]:

"This case was argued on the part of the plaintiff in error and submitted on the part of the defendants in error, on the 23d of October, 1894. On the 3d of December, 1894, leave was granted counsel to file further briefs upon the question of the admissibility of alleged

contradictory statements, and it was stated that the cause would then be taken on resubmission to the full bench on briefs, if counsel should so indicate. On the 10th day of December it was resubmitted."

5. IIIA Wigmore on Evidence (Chadbourn Revision) § 1028, p. 1023; A.L.I. Model Code of Evidence Rule 106(2) and Comment on pages 127, 128; Proposed Rules of Evidence for the United States District Courts and Magistrates—see rules 6–13, 8–06, and the part of the Advisory Committee's Note on page 216.

that that fact does not constitute such complete repudiation of Mattox (considered under the rule that Courts of Appeals have a right, and indeed are under a duty, to refuse slavishly to be bound by a thoroughly discredited ancient opinion of the Supreme Court)[6] as would justify this Court in refusing to follow the *Mattox* decision. There is, however, more.

*Mattox* is clearly distinguishable from the present case upon many grounds, including the following. (1) *Mattox* should not be applied so as to nullify the line of later decisions such as *Mesarosh*, discussed at the beginning of this dissenting opinion. (2) We cannot know much but inferences as to the characters of the two witnesses, James and Violet, offered in the *Mattox* case to impeach the testimony of Whitman, but to say the least, James' character was questionable and that of Violet was uncertain (see 156 U.S. at 244, 245, 15 S.Ct. 337), while in the present case Allemand's own widow, the person least apt to reveal his perjury, testified to his recantation. Not surprisingly, the district judge believed that she testified truthfully. (3) Whitman's recantation was not made on his death bed, while Allemand recanted under the belief that his death was imminent.[7] (4) Whitman's recantation was offered in *Mattox* at a trial on the merits, while Allemand's recantation was offered in this case on motion for new trial. This fourth and last ground of distinction between *Mattox* and the present case is most important, and can best be considered first as it relates to Allemand's retraction of his testimony given on the trial on the merits, and secondly as to his retraction of his testimony given on the hearing of the motion to suppress.

A. *Trial on the merits.* The trial judge has broad discretion in hearing and deciding a motion for new trial. With good reason, McBride's counsel and the government's counsel have vigorously debated the contention of McBride's counsel that " * * * even if the trial Judge had not seen fit to admit the statement attributed to Captain Allemand just before his death *there was already in the record a sharp conflict in his testimony which fairly shouted that perjury had been committed,* and, based on this conflict alone, it was his duty, under the provisions of Rule 33 of the Federal Rules of Criminal Procedure to order a new trial." Supp. Brief of Appellant McBride, p. 2. To shed light on the decision of that contention, it was well within the discretion of the district judge to admit Allemand's recantation.

Further, the majority conclusively assumes that *Mattox* would govern the admissibility of evidence on a new trial (see p. 48 of majority opinion). I submit that is not justified. Before a new trial, there is a clear possibility that the Supreme Court will either have overruled *Mattox* or will have adopted the proposed Rules of Evidence for the United States District Courts and Magistrates which depart completely from *Mattox*. See n. 5, *supra*.

B. *Motion to Suppress.* The motion to suppress was, of course, heard by the court and not by the jury. The applicable Rule 41(e), F.R.Cr.P., provides that "The *judge* shall receive evidence on any issue of fact necessary to the decision of the motion." (Emphasis added.) Less rigorous standards govern the admission of evidence on the hearing of a motion for new trial than those applicable at a trial on the merits. Jones v. United States, 1960, 362 U.S. 257, 269, 80 S.Ct. 725, 4 L.Ed.2d 697. *Mattox* does not purport to limit the admissibility of evidence on a motion to suppress. Clearly the judge, if he believed that Allemand spoke the truth when he retracted his testimony given on the motion to suppress, and if no other and sufficient evidence was offered in opposition to that

---

6. See Browder v. Gayle, M.D.Ala. (3-Judge Court) 1956, 142 F.Supp. 707, 716, n. 14, aff'd (1956); 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114.

7. See n. 1, *supra*.

motion, would be bound to grant the motion. The prime consideration on a motion for new trial under Rule 33 is "the interest of justice." "Justice" as there used obviously means not the trial judge's abstract conception of "justice" but "justice under law."

For the foregoing reasons, I respectfully dissent.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and the Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it, (Rule 35, Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is also denied.

RIVES, Circuit Judge:

I dissent from denial of petition for rehearing by the panel.